**Petition for Naturalization of Larysa IWANENKO.**

**No. 369049.**

United States District Court
N. D. Illinois, E. D.

Oct. 8, 1956.

Roman I. Smook, Chicago, Ill., for petitioner.

Irving I. Freedman, Chicago, Ill., for Immigration and Naturalization Service.

PERRY, District Judge.

The petitioner, Larysa Iwanenko, seeks to take the oath of naturalization after fulfilling all preliminary requirements.

Petitioner is a widow, 48 years of age, and was born in the Ukrainian portion of the Union of Soviet Socialist Republics. She was admitted to the United States through the New York port on January 13, 1950 for permanent residence under the Displaced Persons Act of 1948, 50 U.S.C.A.Appendix, §§ 1951–1965, as a Polish citizen chargeable to the Polish nonpreference quota, and has remained continuously in the United States since that entry.

The Designated Examiner of the Immigration and Naturalization Service has objected to the petition for naturalization on the ground that she has not proven lawful entry in that she made an incorrect statement concerning her birth at the time she was granted a visa, a pattern of misrepresentation which was initiated by her a few years earlier to avoid repatriation to Russia.

The Designated Examiner appeared in court, filed written Amended Findings of Fact, Conclusions of Law and Recommendation, and advanced his objections and recommendation of denial.

In support of his recommendation, the Examiner concluded "that the petitioner is not eligible for naturalization on the ground that she has failed to establish lawful admission to the United States for permanent residence, and is subject to deportation."

The Designated Examiner in his amended Findings of Fact and Conclusions of Law reports a detailed history of the petitioner as follows:

"The petitioner made her formal application for an immigration visa before the American Consul at Stuttgart, Germany, on December 1, 1949. In her visa application she gave her place of birth as Pabianice, Lodz, Poland; this statement has been acknowledged by her to be false, as she was not born in that place but rather in a town that since World War I has been part of the U.S.S.R. The reasons for making this false statement will be set forth at greater length hereafter.

"The petitioner declared her intention to become a citizen of the United States in the United States District Court in Chicago, Illinois, on November 27, 1950. In that application she again stated that she was born in Pabianice, Lodz, Poland.

"The petitioner testified that the reason for her false statements to the American Consul concerning her place of birth was for the sole purpose of averting repatriation to the U.S.S.R. She testified that her father, who was born in Russia, was an Orthodox priest and that since the age of ten she recalls that her father was arrested on numerous occasions by agents of the Communist government because of the fact that he was a priest and because he did not believe in communism. She testified further that her father was tortured by the N.K.V.D., agents of the Communist government; and that in 1937 when her father was sixty-eight years of age, he was spirited away and since that time she has never heard from him. She testified that her husband whom she married in 1928 was also arrested in 1937 because he refused to accept the Communist viewpoint and he, too, disappeared. Subsequently, she heard that he had been killed. After the death of her father and husband she roamed from city to city because of a fear that she, too, would be apprehended by the N.K.V.D. agents. In 1941 when Germany occupied Russia, she was forced to work for the German occupation forces; and in 1943, when the German army retreated from the Ukraine, she and thousands of other Ukrainians were taken to Germany, and she was required to work in a factory.

"At this point, it might be well to examine the proof offered by the petitioner to show her innocence in the matter of the false claim to birth in Poland. She states that such false statements were made under duress and because of circumstances which placed her in fear of being repatriated to Russia; and that she did not attempt to deceive the United States Consul.

"Seven witnesses whose testimony was stipulated testified as to the various phases of these claims and circumstances. Some of these witnesses were displaced persons who had personal experience with conditions abroad prior to the entry of the respondent to the United States. Others, such as Alexandra Tolstoy of the Tolstoy Foundation and the head of the United Ukrainian-American Relief Committee, gave testimony as to their knowledge of the conditions which led the respondent and thousands of other persons similarly situated to make false claims to birth in Poland.

"In essence, their testimony as to conditions in Europe immediately after World War II is as follows: Shortly before World War II ended in Europe, an agreement was entered into, commonly known as the Yalta Agreement. This agreement was made at the Crimean Conference held February 4–11, 1945. The contents of this agreement were not generally known until sometime later. One of the provisions of this agreement was reported to be that the powers involved agreed to return to each other and to assist in such return persons wanted as war criminals, collaborators and others in like category. There is no specific agreement in the published form of the Yalta Agreement that required all citizens of signatory powers to' be returned. After the end of World War II, in Europe, it seemed most natural to Government officials of the various countries, that people who had fled or had been forced to leave their homes would want to return there. The situation, of course, was vastly different with respect to those who came from Communist dominated countries, particularly those from the Ukrainian portion of the U.S.S.R. All of the witnesses testified that subsequent to the close of the fighting in Europe, steps were taken by the American and other Allied authorities to return Russian citizens to Russia, and that sometimes this was done forcibly. On October 4, 1945, certain disturbances had been brought to the attention of the Allied forces of occupation which resulted in the issuance of an order that no more forcible repatriations would take place unless orders to the contrary were received from higher authority. The witnesses further testified that there may have been sporadic instances of forcible repatriations for a short time thereafter but that the last forcible repatriation which could possibly be pointed to took place in 1947, although the major activity seems to have terminated in 1946. It has been testified to, however, that members of the Soviet Repatriation Commission were present in Germany and in various Displaced Persons camps searching for Soviet citizens for a long time thereafter, even as late as 1949.

"There appears to be no doubt that what led the petitioner to originally adopt Poland as her place of birth was the fear of being repatriated to U.S.S.R. She described the conditions which existed in the camps wherein she was located when word was officially given that persons from the Soviet Union would have to register and would have to be returned to Russia. She related how some individuals committed suicide and how others fled from the camp where they were required to register. She testified that she and

her mother also attempted to flee from the camp but returned later because they did not have the strength to walk the long miles to a distant camp. Upon returning, she attempted to register and wanted to furnish her correct place of birth but was advised by sympathetic authorities at the camp that this would cause her to be repatriated to Russia and that it would be best if she were to register as a citizen of Poland. She thereupon seized upon the suggestion and from that time onward she claimed her place of birth to be in Pabianice, Lodz, Poland. Stories of forcible repatriations kept circulating from one D.P. camp to another, and it appears reasonable that the respondent would have feared repatriation even after 1946. The petitioner and the witnesses testified to the effect that individual officers of the UNRRA, individual American Army officers, and officers of other Allied nations in charge of specific Displaced Persons camps, cooperated with persons who wished to conceal their Soviet birth. These persons either encouraged such misrepresentations or did not reveal false birth claims, although they knew of them. In effect, it appears that they closed their eyes to the situation and cooperated with those persons who wished to avoid repatriation to Communist Russia or Communist dominated countries.

"The petitioner's fears, however, were apparently overwhelming due to her particularly harsh and unhappy life in Russia and she was unable to bring herself to inform the American Consul of the true facts concerning her birth. This fear of being repatriated to Russia evidently continued until June of 1954, when in an effort to assist another Ukrainian who was under deportation proceedings, she testified in his behalf."

The Examiner specifically finds that the petitioner's misrepresentation as to her place of birth was made because of her fear of repatriation to Russia.

The first ground for the Examiner's objection is founded upon the claim that the petitioner at the time of her entry on January 13, 1950 was excludable by virtue of Section 13(a) of the Act of May 26, 1924 [1] in that she was not of the nationality specified in her immigration visa. In effect, the legality of her admission to the United States is being challenged. Basically, then, the question is whether or not the petitioner has proven lawful admission as required by 8 U.S.C.A. § 1429.

The requirement of Section 13(a) of the Act of May 26, 1924, namely, that an immigrant be of the nationality specified in the visa, is closely related to the entire quota system because the place of the immigrant's birth, and not residence or citizenship, will determine the quota to which he is chargeable. If the petitioner had gained entry into the United States under the Act of May 26, 1924, the Examiner's ground for objection would be meritorious. In this instance, however, the petitioner was admitted under the Displaced Persons Act of June 25, 1948. 50 U.S.C.A.Appendix, §§ 1951–1965.

The lawfulness of the petitioner's entry then, with all its attendant and preliminary circumstances, must be judged in the light of that Act and particularly the purpose which it was designed to achieve.

At the close of World War II, the victorious nations were faced with a serious problem involving displaced population. The number of displaced persons who were either confined in camps or literally roaming European countries ran into the thousands. In the interest of humanity, it was incumbent upon the victorious nations to afford some relief. Congress discharged the responsibility of the United States in this regard by the enactment of the Displaced Persons

1. Now 8 U.S.C.A. § 1181(a).

Act of 1948 which permitted the entry of 341,000 displaced persons, so defined under international agreements, and an additional number of 54,744 persons of German ethnic origin expelled or forced to flee from several eastern European countries.

While there is no doubt that the Displaced Persons Act of 1948 retained the quota system, it must be said that it carved a very serious inroad into it as well as the administration thereof. This fact is evident from the very language of the Act itself. Basically, it empowered the appropriate officials to issue visas to properly qualified displaced persons "without regard to quota limitations for those years". 50 U.S.C.A.Appendix, § 1952(a). The usual statutory limitation that no more immigrant visas than 10% of the annual quota be issued in any calendar month, 8 U.S.C.A. § 1151 (c) was expressly set aside in this instance. Quotas were to be computed on an annual rather than a monthly basis. 50 U.S.C.A.Appendix, § 1952(c). The significant change, and, for our present purpose a most important one, involved the charging of displaced persons to their respective quotas. Under the quota system, as enacted in the Act of May 26, 1924, the number of immigrant visas issued in any fiscal year could not exceed the quota for that year. Under the Act of 1948, this restriction was relaxed in a very radical manner to afford an immediate solution. The Act of 1948 provided that a particular immigrant would be charged to the quota for the country of his birth for that current fiscal year and, if none was available in that year, to the first succeeding year in which one was available. 50 U.S.C.A.Appendix, § 1952(c). Actually, then, the administration of the quota system under the Displaced Persons Act of 1948 was no longer a rigid operation but more or less resolved itself into a bookkeeping procedure where future quotas over a great number of years were charged and filled. In view of the fact that the Act provided for the entry of 341,000 displaced persons, the conclusion is apparent that many quotas, technically speaking, were closed for years to come. In the interests of practicality and realism, it must be said that this Court has the right to expect that Congress will some day in the near future adjust this particular situation.

When we cast the petitioner's case against this background, the objection of the Immigration Service loses a great deal of its weight. On the basis of the facts as advanced by the Examiner in his report, there is no doubt that she was a displaced person within the provisions of the constitution of the International Refugee Organization. On the basis of his report, she was in a position to express a valid objection to repatriation to Russia. Under all circumstances, and particularly in view of the liberalized quota administration under the Displaced Persons Act of 1948, she could have obtained a visa even if she had truthfully advised the proper official as to her birthplace. The bookkeeping procedure would have been directed to the Russian quota rather than to the Polish quota.

■ It is the view of this Court, and this Court so holds, that the petitioner lawfully entered the United States. Compare U. S. ex rel. Leibowitz v. Schlotfeldt, 7 Cir., 94 F.2d 263.

■■ The second ground for the Examiner's attack upon the lawfulness of the petitioner's entry is founded upon his contentions that the petitioner obtained her entry document through fraud and misrepresentation. Misstatements in an application for an immigration visa, even if knowingly made, are not to be regarded as grounds for deportation, in absence of a showing that the misstatements were prejudicial to the Government in some other sense than that they hampered a complete and full investigation and that the concealed facts are disgraceful or embarrassing, and courts tend to treat such concealment as no ground for deportation, if it is clear that had the concealed fact been disclosed, the attitude of the American admitting au-

thority would have been the same. U. S. ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920; U. S. v. Schlotfeldt, supra; Clarke v. Landon, D.C., 139 F.Supp. 113. There is no showing that the United States was prejudiced by the petitioner's misrepresentation or that the Government's attitude toward her admission would have been different if the truth had been known. On the contrary, the attitude of the Immigration Service is one of sympathy. In view of the relaxed administration of the quota system under the provisions of the Displaced Persons Act of 1948, it is reasonable to assume that she would have obtained a visa even if her true birthplace were known. No showing has been made that it could have been prevented. Accordingly, this Court holds that, in this instance and under these circumstances, her misrepresentation was immaterial.

In this regard, it must be noted that prior to the Act of 1952 the pertinent statutes had never expressly classified an alien as excludable on the ground that he had sought to enter the United States by fraud or wilful misrepresentation. Although the doctrine had been approved as decisional law, it was enacted for the first time in the Act of 1952. 8 U.S.C.A. § 1182(a) (19). In speaking of this section, Congressman Walter made the following statement:

> "It is also the opinion of the Conferees that the sections of the bill which provides for the exclusion of aliens who obtained travel documents by fraud or wilfully misrepresenting a material fact should not serve to exclude or to deport certain bona fide refugees who in fear of being forcefully repatriated to their former homelands misrepresented their place of birth on applying for a visa and such misrepresentation did not have as its basis the desire to evade the quota provisions of the law or an investigation in the place of their former residence. The Conferees wish to emphasize that in applying fair humanitarian standards in the administrative adjudica-

tion of such cases, every effort is to be made to prevent the evasion of law by fraud and to protect the interest of the United States."

In view of the Examiner's specific finding that the petitioner's misrepresentation was made for the purpose of avoiding repatriation to Russia, she should be given the benefit of the prevailing congressional intent in this regard.

This Court must approach a situation of this kind in a realistic manner. The sad fate of may repatriates is notorious. In view of this and of the Designated Examiner's findings of fact in this particular instance, it would be too much to expect that any normal human being would not act in the same manner as the petitioner has acted.

Historically, America has been a haven for political exiles. The greatness of this country attests to the wisdom of that traditional policy. It would be strange, indeed, if, by some technical quirk of the administration of our laws, this, one of our fundamental policies should be circumvented. The Examiner in open court has himself exercised sympathetic concern over the thousands of people who have come to this country as displaced persons and who have concealed their birthplace in order to protect their lives and not for the purpose of deceiving the United States. If, in the instant case, the petitioner had given the false information for the purpose of deceiving the United States, there would be an entirely different situation and she would not be entitled to take the oath of citizenship.

Since this Court supports the lawfulness of the petitioner's entry, the question of deportability is no longer an issue before the Court. This Court should note that deportability in and of itself is insufficient to support a denial of a petition for naturalization. The Act provides that no such petition shall be heard if a deportation proceeding pursuant to a warrant of arrest is pending. No deportation proceeding was pending in this case nor had a warrant for the petitioner's arrest been issued.

844

The objections of the Examiner are overruled. An appropriate order granting the. petition for naturalization has been entered.