# FEDORENKO *v.* UNITED STATES

No. 79–5602.   Argued October 15, 1980—Decided January 21, 1981

Marshall, J., delivered the opinion of the Court, in which Brennan, Stewart, Powell, and Rehnquist, JJ., joined. Burger, C. J., concurred in the judgment. Blackmun, J., filed an opinion concurring in the judgment, *post,* p. 518. White, J., *post,* p. 526, and Stevens, J., *post,* p. 530, filed dissenting opinions.

*Brian M. Gildea* argued the cause and filed a brief for petitioner.

*Attorney General Civiletti* argued the cause for the United States. On the brief were *Solicitor General McCree, Assist-*

*ant Attorney General Heymann, Deputy Solicitor General Geller, Allan A. Ryan, Jr., and David B. Smith.*

JUSTICE MARSHALL delivered the opinion of the Court.

Section 340 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, as amended, 8 U. S. C. § 1451 (a), requires revocation of United States citizenship that was "illegally procured or . . . procured by concealment of a material fact or by willful misrepresentation." [1]  The Government brought this denaturalization action, alleging that petitioner procured his citizenship illegally or by willfully misrepresenting a material fact.  The District Court entered judgment for petitioner, but the Court of Appeals reversed and ordered entry of a judgment of denaturalization.  We granted certiorari, 444 U. S. 1070, to resolve two questions: whether petitioner's failure to disclose, in his application for a visa to come to this country, that he had served during the Second World War as an armed guard at the Nazi concentration camp at Treblinka, Poland, rendered his citizenship revocable as "illegally procured" or procured by willful misrepresentation of a material fact, and if so, whether the District Court nonetheless possessed equitable discretion to refrain from entering judgment in favor of the Government under these circumstances.

---

*Briefs of *amici curiae* urging affirmance were filed by *Phil Baum, Nathan Z. Dershowitz,* and *Marc D. Stern* for the American Jewish Congress et al.; and by *Harold P. Weinberger, Justin J. Finger, Jeffrey P. Sinensky,* and *Richard A. Weisz* for the Anti-Defamation League of B'nai B'rith et al.

[1] Title 8 U. S. C. § 1451 (a) provides in pertinent part:

"It shall be the duty of the United States attorneys . . . to institute proceedings . . . in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation . . . ."

## I

## A

Petitioner was born in the Ukraine in 1907. He was drafted into the Russian Army in June 1941, but was captured by the Germans shortly thereafter. After being held in a series of prisoner-of-war camps, petitioner was selected to go to the German camp at Travnicki in Poland, where he received training as a concentration camp guard. In September 1942, he was assigned to the Nazi concentration camp at Treblinka in Poland, where he was issued a uniform and rifle and where he served as a guard during 1942 and 1943. The infamous Treblinka concentration camp was described by the District Court as a "human abattoir" at which several hundred thousand Jewish civilians were murdered.[2] After an armed uprising by the inmates at Treblinka led to the closure of the camp in August 1943, petitioner was transferred to a German labor camp at Danzig and then to the German prisoner-of-war camp at Poelitz, where he continued to serve as an armed guard. Petitioner was eventually transferred to Hamburg where he served as a warehouse guard. Shortly before the British forces entered that city in 1945, petitioner discarded his uniform and was able to pass as a civilian. For the next four years, he worked in Germany as a laborer.

---

[2] Historians estimate that some 800,000 people were murdered at Treblinka. See L. Dawidowicz, The War Against the Jews, 1933–1945, p. 149 (1975); R. Hilberg, The Destruction of the European Jews 572 (1978).

The District Court described Treblinka in this manner:

"It contained only living facilities for the SS and the persons working there. The thousands who arrived daily on the trains had no need for barracks or mess halls: they would be dead before nightfall. It was operated with a barbarous methodology—brutally efficient—and such camps surely fill one of the darkest chapters in the annals of human existence, certainly the darkest in that which we call Western civilization." 455 F. Supp. 893, 901, n. 12 (SD Fla. 1978).

## B

In 1948, Congress enacted the Displaced Persons Act (DPA or Act), 62 Stat. 1009, to enable European refugees driven from their homelands by the war to emigrate to the United States without regard to traditional immigration quotas. The Act's definition of "displaced persons"[3] eligible for immigration to this country specifically excluded individuals who had "assisted the enemy in persecuting civil[ians]" or had "voluntarily assisted the enemy forces . . . in their operations . . . ."[4] Section 10 of the DPA, 62 Stat. 1013, placed the burden of proving eligibility under the Act on the person seeking admission and provided that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." The Act established an elaborate system for determining eligibility for displaced person status. Each applicant was first interviewed by representatives of the International Refugee Organization of the United Nations (IRO) who ascertained that the person was a refugee or displaced person.[5] The ap-

---

[3] The DPA incorporated the definition of "refugees or displaced persons" contained in Annex I to the Constitution of the International Refugee Organization of the United Nations (IRO). See § 2 (b), 62 Stat. 1009. The IRO Constitution, 62 Stat. 3037–3055, was ratified by the United States on December 16, 1946 (T. I. A. S. No. 1846) and became effective on August 20, 1948. See 62 Stat. 3037.

[4] The IRO Constitution provided that the following persons would not be eligible for refugee or displaced person status:

"1. War criminals, quislings and traitors.

"2. Any other persons who can be shown:

"(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

"(b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Part II, 62 Stat. 3051–3052.

[5] The IRO was established in 1946 as a temporary specialized agency of the United Nations to deal with all aspects of the refugee problem in

plicant was then interviewed by an official of the Displaced Persons Commission,[6] who made a preliminary determination about his eligibility under the DPA. The final decision was made by one of several State Department vice consuls, who were specially trained for the task and sent to Europe to administer the Act.[7] Thereafter, the application was reviewed by officials of the Immigration and Naturalization Service (INS) to make sure that the applicant was admissible into the United States under the standard immigration laws.

In October 1949, petitioner applied for admission to the United States as a displaced person. Petitioner falsified his visa application by lying about his wartime activities. He told the investigators from the Displaced Persons Commission that he had been a farmer in Sarny, Poland, from 1937 until March 1942, and that he had then been deported to Germany and forced to work in a factory in Poelitz until the end of the war, when he fled to Hamburg.[8] Petitioner told the same

---

postwar Europe. The IRO established and administered a network of camps and resettlement centers where the refugees were registered, housed, fed, and provided with medical care. Where possible, the IRO provided for the refugees' rehabilitation and training, arranged legal protection for as long as they were stateless, and negotiated agreements for resettlement. See generally L. Holborn, The International Refugee Organization: A Specialized Agency of The United Nations: Its History and Work 1946–1952 (1956).

[6] The DPA established a Displaced Persons Commission to oversee and administer the resettlement program envisaged by the Act. 62 Stat. 1012–1013.

[7] According to testimony presented at trial by one of the Government's witnesses who served as a vice consul, between 35 and 40 vice consuls were involved in administering the Act. Record 715. Each vice consul spent three months in training in Washington and was then sent to Europe where he received further training before he was put to work reviewing applications. Id., at 711–712, 719–721, 723, 726–727.

[8] Petitioner also lied about his birthplace and nationality, claiming that he was born in Sarny, in Poland, when in fact he was born in Sivasch, in the Ukraine. App. 26. However, on November 21, 1950, after he arrived in this country, petitioner filed an Application for a Certificate of

story to the vice consul who reviewed his case and he signed a sworn statement containing these false representations as part of his application for a DPA visa. Petitioner's false statements were not discovered at the time and he was issued a DPA visa, and sailed to the United States where he was admitted for permanent residence. He took up residence in Connecticut and for three decades led an uneventful and law-abiding life as a factory worker.

In 1969, petitioner applied for naturalization at the INS office in Hartford, Conn. Petitioner did not disclose his wartime service as a concentration camp armed guard in his application,[9] and he did not mention it in his sworn testimony to INS naturalization examiners. The INS examiners took petitioner's visa papers at face value and recommended that his citizenship application be granted. On this recommendation, the Superior Court of New Haven County granted his petition for naturalization and he became an American citizen on April 23, 1970.

C

Seven years later, after petitioner had moved to Miami Beach and become a resident of Florida,[10] the Government filed this action in the United States District Court for the Southern District of Florida to revoke petitioner's citizenship. The complaint alleged that petitioner should have been deemed ineligible for a DPA visa because he had served as an armed guard at Treblinka and had committed crimes or atroc-

---

Arrival and Preliminary Form for a Declaration of Intention in which he correctly listed his birthplace as Sivasch in the Ukraine. Petitioner again provided the correct information when he filed a similar form on April 7, 1951. 455 F. Supp., at 911.

[9] It should be noted that none of the questions in the application for citizenship explicitly required petitioner to disclose this information. Perhaps the most closely related question on the application form was one that required him to list his foreign military service. Petitioner indicated only that he had served in the Russian Army. App. 33.

[10] See 455 F. Supp., at 896, n. 3.

ities against inmates of the camp because they were Jewish. The Government charged that petitioner had willfully concealed this information both in applying for a DPA visa and in applying for citizenship, and that therefore petitioner had procured his naturalization illegally or by willfully misrepresenting material facts.[11]

The Government's witnesses at trial included six survivors of Treblinka who claimed that they had seen petitioner commit specific acts of violence against inmates of the camp.[12] Each witness made a pretrial identification of petitioner from a photo array that included his 1949 visa photograph, and three of the witnesses made courtroom identifications. The Government also called as a witness Kempton Jenkins, a career foreign service officer who served in Germany after the war as one of the vice consuls who administered the DPA. Jenkins had been trained to administer the Act and had re-

---

[11] The complaint also charged that petitioner had deliberately made false statements for the purpose of securing his naturalization and had thereby failed to satisfy the statutory requirement of good moral character during the 5-year period immediately preceding the filing of his application for naturalization. See 8 U. S. C. § 1427 (a).

[12] One witness Eugeun Turowski, testified that he saw petitioner shoot and whip Jewish prisoners at the camp. Record 134–136. Another, Schalom Kohn, testified that he saw petitioner almost every day for the first few months Kohn was at Treblinka, *id.*, at 262–263, that petitioner beat him with an iron-tipped whip, and that he saw petitioner whip and shoot other prisoners. *Id.*, at 268, 271, 322–323. The third witness, Josef Czarny, claimed that he saw petitioner beat arriving prisoners, *id.*, at 434, and that he once saw him shoot a prisoner. *Id.*, at 435–442. Gustaw Boraks testified that he saw petitioner repeatedly chase prisoners to the gas chambers, beating them as they went. *Id.*, at 886–888. Boraks also claimed that on one occasion, he heard a shot and ran outside to see petitioner, with a gun drawn, standing close to a wounded woman who later told him that petitioner was responsible for the shooting. *Id.*, at 630–634. Sonia Lewkowicz testified that she saw petitioner shoot a Jewish prisoner. *Id.*, at 973, 1013–1015, 1039–1040. Finally, Pinchas Epstein testified that petitioner shot and killed a friend of his, after making him crawl naked on all fours. *Id.*, at 1056–1070.

viewed some 5,000 visa applications during his tour of duty. Record 711–714, 720–722. Without objection from petitioner, Jenkins was proffered by the Government and accepted by the court, as an expert witness on the interpretation and application of the DPA. *Id.*, at 719–721, 726–727, 734.

Jenkins testified that the vice consuls made the final decision about an applicant's eligibility for displaced person status.[13] He indicated that if there had been any suggestion that an applicant "had served or been involved in" a concentration camp, processing of his application would have been suspended to permit a thorough investigation. *Id.*, at 766. If it were then determined that the applicant had been an armed guard at the camp, he would have been found ineligible for a visa as a matter of law. *Id.*, at 767–768, 822. Jenkins explained that service as an armed guard at a concentration camp brought the applicant under the statutory exclusion of persons who "assisted the enemy in persecuting civil[ians]," regardless of whether the applicant had not volunteered for service[14] or had not committed atrocities against inmates. *Id.*, at 768, 797–798. Jenkins emphasized that this interpretation of the Act was "uniformly" accepted by the vice consuls, and that furthermore, he knew of no case in which a known concentration camp guard was found eligible for a DPA visa.[15] *Id.*, at 767. Jenkins also described the elabo-

---

[13] The vice consul's decision could be overridden by the consul general, but Jenkins testified that he knew of no situation in which this happened. *Id.*, at 721–722.

[14] On the basis of the vice consuls' experiences, Jenkins discounted the possibility that any concentration camp guards had served involuntarily. *Id.*, at 756, 772, 795–796. Jenkins reported that all the guards who were questioned by the consular officials about their reasons for serving as guards invariably admitted that their service was voluntary. *Id.*, at 807–808. In addition, Jenkins testified that even if an applicant refused to acknowledge that his service as an armed guard was voluntary, he would still have been denied a visa. *Id.*, at 822–826.

[15] Jenkins testified that at times concentration camp survivors who recognized a visa applicant as a guard would notify consular officials who

rate system that was used to screen visa applicants and he testified that in interviewing applicants, the vice consuls bent over backwards in interrogating each person to make sure the applicant understood what he was doing. *Id.*, at 746.

Petitioner took the stand in his own behalf. He admitted his service as an armed guard at Treblinka and that he had known that thousands of Jewish inmates were being murdered there. *Id.*, at 1442, 1451–1452, 1465. Petitioner claimed that he was forced to serve as a guard and denied any personal involvement in the atrocities committed at the camp, *id.*, at 1276, 1297–1298, 1539–1540; he insisted that he had merely been a perimeter guard. Petitioner admitted, however, that he had followed orders and shot in the general direction of escaping inmates during the August 1943 uprising that led to closure of the camp. *Id.*, at 1507–1509, 1546, 1564. Petitioner maintained that he was a prisoner of war at Treblinka, *id.*, at 1495, although he admitted that the Russian armed guards significantly outnumbered the German soldiers at the camp,[16] that he was paid a stipend and received a good service stripe from the Germans, and that he was allowed to leave the camp regularly but never tried to escape. *Id.*, at 1467–1471, 1489–1494, 1497, 1508.[17] Finally, petitioner conceded that he deliberately gave false statements about his wartime activities to the investigators from the Displaced Persons Commission and to the vice consul who reviewed his visa application. *Id.*, at 1518–1524.

The District Court entered judgment in favor of petitioner.

---

in turn investigated the matter. If the accusation proved true, the applicant was confronted with it and invariably found ineligible for a visa. *Id.*, at 804, 807, 826–827.

[16] Petitioner testified that there were between 120 and 150 armed Russian guards and some 20 to 30 Germans. *Id.*, at 1444–1445.

[17] Petitioner testified that between 15 and 20 Russian guards escaped from the camp. Four were caught and apparently executed, but petitioner testified that he did not know what happened to the others. *Id.*, at 1535–1536, 1555.

455 F. Supp. 893 (1978). The court found that petitioner had served as an armed guard at Treblinka and that he lied about his wartime activities when he applied for a DPA visa in 1949.[18] The court found, however, that petitioner was forced to serve as a guard. The court concluded that it could credit neither the Treblinka survivors' identification of petitioner nor their testimony,[19] and it held that the Government had not met its burden of proving that petitioner committed war crimes or atrocities at Treblinka.

Turning to the question whether petitioner's false statements about his activities during the war were misrepresentations of "material" facts, the District Court, relying on our decision in *Chaunt* v. *United States,* 364 U. S. 350 (1960), held that the Government had to prove

"that either (1) facts were suppressed 'which, if known, would have warranted denial of citizenship' or (2) that their disclosure 'might have been useful in an investiga-

---

[18] The court also noted that there was no dispute about the fact that petitioner lied when he listed his birthplace as Sarny, Poland. 455 F. Supp., at 914.

[19] The court rejected the witnesses' pretrial identifications because it found the photo spreads from which the identifications were made impermissibly suggestive. The court also rejected the in-court identifications by three of the witnesses. The court noted that the first witness initially picked out a spectator in the courtroom and only identified petitioner when it became obvious from the crowd reaction that he had made a mistake. The other two witnesses identified petitioner who was seated at counsel table surrounded by much younger men. The court concluded that the courtroom identifications were tainted by the photo identification and by discussion of the case among the witnesses.

The court also found credibility problems with the testimony of the Treblinka survivors, and it concluded that "[e]ven without defendant's testimony, the Government's evidence on the claimed commission of atrocities . . . fell short of meeting the 'clear, convincing and unequivocal' burden of proof. . . . With defendant's testimony the Government's evidence . . . left the court with suspicions about whether defendant participated in atrocities at Treblinka but they were only suspicions." *Id.,* at 909.

tion possibly leading to the discovery of other facts warranting denial of citizenship.' " 455 F. Supp., at 915 (quoting 364 U. S., at 355).

The District Court rejected the Government's claim that disclosure of petitioner's service as a concentration camp armed guard would have been grounds for denial of citizenship. The court therefore ruled that the withheld facts were not material under the first *Chaunt* test. The Government argued, however, that the second *Chaunt* test did not require proof that the concealed facts prevented an investigation that *would* have revealed facts warranting denial of citizenship. The Government contended instead that the second test merely required proof that an investigation *might* have uncovered such facts and it argued that petitioner's concealment of his service at Treblinka fell within this test. The District Court conceded that the language of *Chaunt* was ambiguous enough to support the Government's interpretation of the second test. But relying on decisions by the United States Courts of Appeals for the Third and Ninth Circuits,[20] the District Court rejected the Government's position and interpreted both *Chaunt* tests as requiring proof that "the true facts would have warranted denial of citizenship." 455 F. Supp., at 916. Applying this test, the court ruled that petitioner's false statements were not "material" within the meaning of the denaturalization statute. In doing so, the court first rejected Jenkins' testimony and held that petitioner was not ineligible for a DPA visa. The court concluded that petitioner did not come under the DPA's exclusion of persons who had assisted in the persecution of civilians because he had served involuntarily. Second, the court found that although disclosure of petitioner's service as a Treblinka guard "certainly would" have prompted an investigation into

---

[20] *United States* v. *Riela*, 337 F. 2d 986 (CA3 1964); *United States* v. *Rossi*, 299 F. 2d 650 (CA9 1962); *La Madrid-Peraza* v. *Immigration and Naturalization Service*, 492 F. 2d 1297 (CA9 1974).

his activities, the Government had failed to prove that such an inquiry would have uncovered any additional facts warranting denial of petitioner's application for a visa. *Id.,* at 916.[21]

As an alternative basis for its decision, the District Court held that even assuming that petitioner had misrepresented "material" facts, equitable and mitigating circumstances required that petitioner be permitted to retain his citizenship. Specifically, the court relied on its finding that the evidence that petitioner had committed any war crimes or atrocities at Treblinka was inconclusive, as well as the uncontroverted evidence that he had been responsible and law-abiding since coming to the United States. The District Court suggested that this Court had not previously considered the question whether a district court has discretion to consider the equities in a denaturalization case. The court reasoned that since *naturalization* courts have considered the equities in determining whether citizenship should be granted, similar discretion should also be available in *denaturalization* proceedings.

The Court of Appeals for the Fifth Circuit reversed and remanded the case with instructions to enter judgment for the Government and to cancel petitioner's certificate of citizenship. 597 F. 2d 946 (1979). Although the Court of Appeals agreed with the District Court that *Chaunt* was controlling on the question of the materiality of petitioner's false statements, it disagreed with the District Court's interpreta-

---

[21] The court also found that petitioner's false statements about his birthplace and nationality were not "material" misrepresentations. The court explained that the true facts would not of themselves have justified denial of citizenship since Ukrainians *per se* were not excluded under the DPA. The court also noted that petitioner disclosed the truth about his place of birth and nationality when he filed Declarations of Intention in 1950 and 1951, and that the INS examiner who interviewed petitioner in connection with his application for citizenship testified that his previous false statements about these questions were not a cause for concern. 455 F. Supp., at 915.

tion of the second *Chaunt* test as requiring proof of ultimate facts warranting denial of citizenship. Instead, the Court of Appeals agreed with the Government that the second *Chaunt* test requires only clear and convincing proof that (a) disclosure of the true facts *would* have led to an investigation and (b) the investigation *might* have uncovered other facts warranting denial of citizenship.[22]

In applying its formulation of the second *Chaunt* test to the facts of the case, the Court of Appeals concluded that one part of the test was satisfied by the District Court's finding that the American authorities *would* have conducted an investigation if petitioner had disclosed that he had served as an armed guard at Treblinka. The Court of Appeals then found that Jenkins' testimony and other evidence before the District Court clearly and convincingly proved that the investigation *might* have resulted in denial of petitioner's application for a visa [23] and the Court of Appeals held that petitioner procured his naturalization "by misrepresentation and concealment of his whereabouts during the war years and his service as a concentration camp guard." 597 F. 2d, at 953. The Court of Appeals further held that the District Court had erred in supposing that it had discretion to enter judgment in favor of petitioner notwithstanding a finding that

---

[22] The Court of Appeals explained that the District Court's interpretation "destroyed the utility of the second *Chaunt* test, since it would require, as does the first *Chaunt* test, that the government prove ultimate facts warranting denial of citizenship." 597 F. 2d, at 951. The court also pointed out that adopting the District Court's view would provide a strong incentive to an applicant for a visa or citizenship to lie about his background and thereby prevent an inquiry into his fitness at a time when he has the burden of proving eligibility. If his deception were later uncovered, the Government would face the difficult tasks of conducting an inquiry into his past, discovering facts warranting disqualification, and proving those facts by clear and convincing evidence. *Ibid.*

[23] The Court of Appeals noted that its formulation of the second *Chaunt* test was adopted by the Second Circuit in *United States* v. *Oddo*, 314 F. 2d 115, cert. denied, 375 U. S. 833 (1963).

petitioner had procured his naturalization by willfully concealing material facts. The Court of Appeals concluded that "[t]he denaturalization statute . . . does not accord the district courts any authority to excuse the fraudulent procurement of citizenship." *Id.*, at 954. Accordingly, the Court of Appeals held that petitioner's citizenship must be revoked.[24] We affirm, but for reasons which differ from those stated by the Court of Appeals.

## II

Our examination of the questions presented by this case must proceed within the framework established by two lines of prior decisions of this Court that may, at first blush, appear to point in different directions.

On the one hand, our decisions have recognized that the right to acquire American citizenship is a precious one, and that once citizenship has been acquired, its loss can have severe and unsettling consequences. See *Costello* v. *United States*, 365 U. S. 265, 269 (1961); *Chaunt* v. *United States*, 364 U. S., at 353; *Baumgartner* v. *United States*, 322 U. S. 665, 675–676 (1944); *Schneiderman* v. *United States*, 320 U. S. 118, 122 (1943). For these reasons, we have held that the Government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello* v. *United States*, *supra*, at 269. The evidence justifying revocation of citizenship must be " 'clear, unequivocal, and convincing' " and not leave " 'the issue in doubt.' " *Schneiderman* v. *United States*, *supra*, at 125 (quoting *Maxwell Land-Grant Case*, 121 U. S. 325, 381 (1887)). Any less exacting standard would be inconsistent with the importance of the right that

---

[24] Because it ruled in favor of the Government under the second *Chaunt* test, the Court of Appeals had no reason to consider the Government's claim that, contrary to the District Court's findings, the evidence at trial clearly and convincingly proved that petitioner committed crimes and atrocities against inmates while he was an armed guard at Treblinka. We accept, for purposes of this case, the District Court's findings on this issue.

is at stake in a denaturalization proceeding. And in reviewing denaturalization cases, we have carefully examined the record ourselves. See, *e. g., Costello* v. *United States, supra; Chaunt* v. *United States, supra; Nowak* v. *United States,* 356 U. S. 660 (1958); *Baumgartner* v. *United States, supra.*

At the same time, our cases have also recognized that there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship "illegally procured," and naturalization that is unlawfully procured can be set aside. 8 U. S. C. § 1451 (a); *Afroyim* v. *Rusk,* 387 U. S. 253, 267, n. 23 (1967). See *Maney* v. *United States,* 278 U. S. 17 (1928); *United States* v. *Ness,* 245 U. S. 319 (1917); *United States* v. *Ginsberg,* 243 U. S. 472 (1917). As we explained in one of these prior decisions:

> "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. . . .
>
> · · · · ·
>
> "No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it . . . and demand its cancellation unless issued in accordance with such requirements." *United States* v. *Ginsberg, supra,* at 474–475.

This judicial insistence on strict compliance with the statutory conditions precedent to naturalization is simply an acknowledgment of the fact that Congress alone has the constitutional authority to prescribe rules for naturalization,[25] and the courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizen-

---

[25] The Constitution empowers Congress to "establish an uniform Rule of Naturalization." Art. I, § 8, cl. 4.

ship by naturalization legislated to safeguard the integrity of this "priceless treasure." *Johnson* v. *Eisentrager,* 339 U. S. 763, 791 (1950) (Black, J., dissenting).

Thus, what may at first glance appear to be two inconsistent lines of cases actually reflect our consistent recognition of the importance of the issues that are at stake—for the citizen as well as the Government—in a denaturalization proceeding. With this in mind, we turn to petitioner's contention that the Court of Appeals erred in reversing the judgment of the District Court.

## III

Petitioner does not and, indeed, cannot challenge the Government's contention that he willfully misrepresented facts about his wartime activities when he applied for a DPA visa in 1949. Petitioner admitted at trial that he "willingly" gave false information in connection with his application for a DPA visa so as to avoid the possibility of repatriation to the Soviet Union.[26] Record 1520. The District Court specifically noted that there was no dispute that petitioner "lied" in his application. 455 F. Supp., at 914. Thus, petitioner falls within the plain language of the DPA's admonition that "[a]ny person who shall willfully make a misrepresentation for the purposes of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." 62 Stat. 1013. This does not, however, end our inquiry, because we agree with the Government[27] that this provision only applies to willful misrepresentations about "material" facts.[28] The first issue we must

---

[26] That petitioner gave these false statements because he was motivated by fear of repatriation to the Soviet Union indicates that he understood that disclosing the truth would have affected his chances of being admitted to the United States and confirms that his misrepresentation was willful.

[27] See Brief for United States 18, n. 13.

[28] Although the denaturalization statute speaks in terms of "willful misrepresentation" or "concealment of a material fact," this Court has indi-

examine then, is whether petitioner's false statements about his activities during the war, particularly the concealment of his Treblinka service, were "material."

## A

At the outset, we must determine the proper standard to be applied in judging whether petitioner's false statements were material. Both petitioner and the Government have assumed, as did the District Court and the Court of Appeals, that materiality under the above-quoted provision of the DPA is governed by the standard announced in *Chaunt* v. *United States,* 364 U. S. 350 (1960). But we do not find it so obvious that the *Chaunt* test is applicable here. In that case, the Government charged that Chaunt had procured his citizenship by concealing and misrepresenting his record of arrests in the United States in his application for citizenship, and that the arrest record was a "material" fact within the meaning of the denaturalization statute.[29] Thus, the materiality standard announced in that case pertained to false statements in applications for *citizenship,* and the arrests that Chaunt failed to disclose all took place after he came to this country. The case presented no question concerning the lawfulness of his initial entry into the United States.

In the instant case, however, the events on which the Government relies in seeking to revoke petitioner's citizenship took place before he came to this country and the Govern-

---

cated that the concealment, no less than the misrepresentation, must be willful and that the misrepresentation must also relate to a material fact. See *Costello* v. *United States,* 365 U. S. 265, 271–272, n. 3 (1961). Logically, the same principle should govern the interpretation of this provision of the DPA.

[29] One question on the form Chaunt submitted in connection with his petition for citizenship, asked if he had ever "been arrested or charged with violation of any law of the United States or State or city ordinance or traffic regulation" and if so give full particulars. To this question Chaunt answered "no."

ment is seeking to revoke petitioner's citizenship because of the alleged unlawfulness of his initial entry into the United States. Although the complaint charged that petitioner misrepresented facts about his wartime activities in both his application for a visa and his application for naturalization, both the District Court and the Court of Appeals focused on the false statements in petitioner's application for a visa. Thus, under the analysis of both the District Court and the Court of Appeals, the misrepresentation that raises the materality issue in this case was contained in petitioner's application for a visa.[30] These distinctions plainly raise the important question whether the *Chaunt* test for materiality of misrepresentations in applications for *citizenship* also applies to false statements in *visa* applications.

It is, of course, clear that the materiality of a false statement in a visa application must be measured in terms of its effect on the applicant's admissibility into this country. See *United States* v. *Rossi*, 299 F. 2d 650, 652 (CA9 1962). At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa. Because we conclude that disclosure of the true facts about petitioner's service as an armed guard at Treblinka would, as a matter of law, have made him ineligible for a visa under the DPA, we find it unnecessary to resolve the question whether *Chaunt's* materiality test also governs false statements in visa applications.

Section 2 (b) of the DPA, 62 Stat. 1009, by incorporating the definition of "[p]ersons who will not be [considered dis-

---

[30] Neither the District Court nor the Court of Appeals directly focused on the distinction between false statements in a visa application and false statements in an application for citizenship. The District Court's opinion suggests that it concluded that there were no willful misrepresentations in petitioner's 1970 application for citizenship. See 455 F. Supp., at 916–917. The Court of Appeals characterized the case as involving "a misrepresentation by nondisclosure." 597 F. 2d, at 947.

placed persons]" contained in the Constitution of the IRO, see n. 3, *supra,* specifically provided that individuals who "assisted the enemy in persecuting civil[ians]" were ineligible for visas under the Act.[31] Jenkins testified that petitioner's service as an armed guard at a concentration camp—whether voluntary or not—made him ineligible for a visa under this provision.[32] Jenkins' testimony was based on his firsthand

---

[31] Hereafter, references to §§ 2 (a) and 2 (b), rather than referring to §§ 2 (a) and 2 (b) of the DPA, follow the designation of the definitional provisions in the IRO Constitution, see 62 Stat. 3051–3052, incorporated in § 2 (b) of the DPA.

[32] Jenkins testified as follows:

"Q If through investigation or interview you had determined that [a visa] applicant in fact did serve at a death camp . . . in occupied Poland as a Ukrainian Guard would you have denied the visa application?

"A Yes, I would.

"Q And in your expert opinion would such a person have qualified as an eligible displaced person?

"A No, he would not have.

"Q I may have asked this question, if I have permit me to ask it again, . . . are you aware of any case whatsoever in which an axis auxiliary who served in a capacity as a camp guard was ever legally qualified as a displaced person?

"A No, I am not. I am reasonably certain that there was no such case.

.        .        .        .        .

"Q Mr. Jenkins, referring to the last question and answer, would it have made any difference whatsoever to you as a visa officer if the person could have been proven to have been a guard but you could not prove that he committed an atrocity?

"A No.

"THE COURT: Why? Why?

"THE WITNESS: Because under the Displaced Persons Act and in the International Refugee Organization constitution by . . . definition such a person could not be a displaced person." Record 767–768.

On cross-examination, Jenkins was asked:

"Q Despite the apparent assumption that a guard at a concentration camp was there voluntarily, a non-German was there voluntarily, if a non-German guard came to you and said to you that his service there was

experience as a vice consul in Germany after the war reviewing DPA visa applications. Jenkins also testified that the practice of the vice consuls was to circulate among the other vice consuls the case files of any visa applicant who was shown to have been a concentration camp armed guard. Record 826. Thus, Jenkins and the other vice consuls were particularly well informed about the practice concerning the eligibility of former camp guards for DPA visas. The District Court evidently agreed that a literal interpretation of the statute would confirm the accuracy of Jenkins' testimony. 455 F. Supp., at 913. But by construing § 2 (a) as only excluding individuals who *voluntarily* assisted in the persecution of civilians, the District Court was able to ignore Jenkins' uncontroverted testimony about how the Act was interpreted by the officials who administered it.[33]

---

involuntary would that guard have been eligible under the Displaced Persons Act and would he have been granted a visa?

"A I don't believe so. In the first place I can't imagine this hypothetical situation. And secondly, I think the language of the Act is so clear that participation or even acquiesce[nce] in really doesn't leave the vice consul that kind of latitude.

.        .        .        .        .

"THE COURT: . . . What is there about it that would make you think it was so clear that you had no latitude, if he had according to the hypothetical, persuaded you that his service as a guard was involuntary? How would that differ from involuntary service in the Waffen SS [Axis combat unit]?

"A Because the crime against humanity that is involved in the concentration camp puts it into a different category . . . ." *Id.*, at 822–823.

[33] The District Court felt compelled to impose a voluntariness requirement because it was concerned that a literal interpretation of § 2 (a) would "bar every Jewish prisoner who survived Treblinka because each one of them assisted the SS in the operation of the camp." 455 F. Supp., at 913. The court noted that working prisoners led arriving prisoners to the lazaret where they were murdered, cut the hair of the women who were to be executed, or played in the orchestra at the gate to the camp as part of the Germans' ruse to persuade new arrivals that the camp was other than what it was. The court pointed out that such actions could tech-

The Court of Appeals evidently accepted the District Court's construction of the Act since it agreed that the Government had failed to show that petitioner was ineligible for a DPA visa. 597 F. 2d, at 953. Because we are unable to find any basis for an "involuntary assistance" exception in the language of § 2 (a), we conclude that the District Court's construction of the Act was incorrect. The plain language of the Act mandates precisely the literal interpretation that the District Court rejected: an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa. That Congress was perfectly capable of adopting a "voluntariness" limitation where it felt that one was necessary is plain from comparing § 2 (a) with § 2 (b), which excludes only those individuals who *"voluntarily"* assisted the enemy forces . . . in their operations . . . ." Under traditional principles of statutory construction, the deliberate omission of the word "voluntary" from § 2 (a) compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas.[34] See *National Railroad Passenger Corp.*

---

nically be deemed assistance, and concluded that it would be "absurd to deem their conduct 'assistance or acquiescence' inasmuch as it was involuntary—even though the word 'voluntarily' was omitted from the definition." *Ibid.* In addition, the court noted that Jenkins testified that visa applicants who had served in Axis combat units and who could prove that their service was involuntary were found eligible for visas. *Id.*, at 912. But see n. 34, *infra.*

[34] The solution to the problem perceived by the District Court, see n. 33, *supra,* lies, not in "interpreting" the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits

v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458 (1974); *Botany Worsted Mills* v. *United States,* 278 U. S. 282, 289 (1929). As this Court has previously stated: "We are not at liberty to imply a condition which is opposed to the explicit terms of the statute. . . . To [so] hold . . . is not to construe the Act but to amend it." *Detroit Trust Co.* v. *The Thomas Barlum,* 293 U. S. 21, 38 (1934). See *FTC* v. *Sun Oil Co.,* 371 U. S. 505, 514–515 (1963). Thus, the plain language of the statute and Jenkins' uncontradicted and unequivocal testimony leave no room for doubt that if petitioner had disclosed the fact that he had been an armed guard at Treblinka, he would have been found ineligible for a visa under the DPA.[35] This being so, we must conclude that peti-

within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case. As for the District Court's concern about the different treatment given to visa applicants who had served in Axis combat units who were found eligible for visas if they could show that they had served involuntarily, this distinction was made by the Act itself.

[35] The District Court refused to give conclusive weight to Jenkins' testimony on this issue largely because it felt that Jenkins' testimony did not recognize the "voluntariness" exception that the court read into § 2 (a). However, Jenkins' testimony was in accordance with the plain language of the statute. Because the District Court mistakenly applied the law to the facts of this case in concluding that petitioner was lawfully admitted into this country, 455 F. Supp., at 915, we reject its conclusion.

The dissenting opinion of JUSTICE STEVENS argues that the Government "expressly disavowed" our interpretation of the DPA, *post,* at 530, and that the Government "unequivocally accepted" the District Court's construction of § 2 (a), *post,* at 535. Elsewhere, the dissent suggests that the District Court's construction is "the Government's interpretation of the statute," *post,* at 536. The sole basis for these assertions is a footnote in the Government's brief in the Court of Appeals which merely stated: "The United States *has no quarrel with* [the District Court's] construction [of § 2 (a)] *in this case*" (emphasis added). In our judgment, none of the dissent's claims is borne out by this statement. The suggestion that the Government "unequivocally accepted" the District Court's interpretation of the Act is at best an exaggeration, and we have found no evidence in the record or briefs in this case of the Government's

tioner's false statements about his wartime activities were "willfu[l] [and material] misrepresentation[s] [made] for the purpose of gaining admission into the United States as an eligible displaced person." 62 Stat. 1013. Under the express terms of the statute, petitioner was "thereafter not . . . admissible into the United States." *Ibid.*

Our conclusion that petitioner was, as a matter of law, ineligible for a visa under the DPA makes the resolution of this case fairly straightforward. As noted, *supra,* at 506–507, our cases have established that a naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as "illegally procured" under 8 U. S. C. § 1451 (a). In 1970, when petitioner filed his application for and was admitted to citizenship, §§ 316 (a) and 318 of the Immigration and Nationality Act of 1952, 8 U. S. C. §§ 1427 (a) and 1429, required an applicant for citizenship to be lawfully admitted to the United States for permanent residence.[36] Lawful admission for per-

"express disavowal" of our construction of § 2 (a). Furthermore, being neither endowed with psychic powers nor privy to the Government's deliberations, we cannot join JUSTICE STEVENS, see *post,* at 535–536, in speculating about the reasons that the Government chose not to "quarrel with" the District Court's interpretation of § 2 (a) "in this case."

As for JUSTICE STEVENS' belief that our interpretation of the statute is "erroneous," see *post,* at 533, we simply note that he is unable to point to anything in the language of the Act that justifies reading into § 2 (a) the "voluntariness" limitation that Congress omitted. Thus, we must conclude that JUSTICE STEVENS' real quarrel is with Congress, which drafted the statute. It is not the function of the courts to amend statutes under the guise of "statutory interpretation." See *Potomac Electric Power Co.* v. *Director, Office of Workers' Compensation Programs, ante,* at 274. Finally, since the term "persecution" does not apply to some of the tasks performed by concentration camp inmates, see n. 34, *supra,* we reject the speculation that our decision "may jeopardize the citizenship of countless survivors of Nazi concentration camps," *post,* at 530 (STEVENS, J., dissenting).

[36] Title 8 U. S. C. § 1429 provides in pertinent part: "[N]o person shall be naturalized unless he has been lawfully admitted to the United States

manent residence in turn required that the individual possess a valid unexpired immigrant visa. At the time of petitioner's initial entry into this country, § 13 (a) of the Immigration and Nationality Act of 1924, ch. 190, 43 Stat. 153, 161 (repealed in 1952), provided that "[n]o immigrant shall be admitted to the United States unless he (1) has an unexpired immigration visa . . . ." [37] The courts at that time consistently held that § 13 (a) required a valid visa and that a visa obtained through a material misrepresentation was not valid. See, *e. g.*, *Ablett* v. *Brownell,* 99 U. S. App. D. C. 387, 391, 240 F. 2d 625, 629 (1957); *United States ex rel. Jankowski* v. *Shaughnessy,* 186 F. 2d 580, 582 (CA2 1951). Section 10 of the DPA, 62 Stat. 1013, provided that "all immigration laws, . . . shall be applicable to . . . eligible displaced . . . persons who apply to be or who are admitted into the United States pursuant to this Act." And as previously noted, petitioner was inadmissible into this country under the express terms of the DPA. Accordingly, inasmuch as petitioner failed to satisfy a statutory requirement which Congress has imposed as a prerequisite to the acquisition of citizenship by naturalization, we must agree with the Government that petitioner's citizenship must be revoked because it was "illegally procured." See *Polites* v. *United States,* 364 U. S. 426, 436–437 (1960); *Schwinn* v. *United States,* 311 U. S. 616 (1940); *Maney* v. *United States,* 278 U. S., at 22–23; *United States* v. *Ginsberg,* 243 U. S., at 475; *Luria* v. *United States,* 231 U. S. 9, 17 (1913); *Johannessen* v. *United States,* 225 U. S. 227, 240 (1912). Cf. *Schneiderman* v. *United States,* 320 U. S., at 163 (Douglas, J., concurring). [38] In the lexicon

for permanent residence in accordance with all applicable provisions of this chapter." See also 8 U. S. C. § 1427 (a).

[37] The same requirement is now contained in 8 U. S. C. § 1181 (a) which provides that "no immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa . . . ."

[38] See H. R. Rep. No. 1086, 87th Cong., 1st Sess., 39 (1961) (Citizenship

of our cases, one of the "jurisdictional facts upon which the grant [of citizenship] is predicated," *Johannessen* v. *United States, supra,* at 240, was missing at the time petitioner became a citizen.

## B

This conclusion would lead us to affirm on statutory grounds (and not on the basis of our decision in *Chaunt*), the judgment of the Court of Appeals. Petitioner argues, however, that in a denaturalization proceeding, a district court has discretion to consider the equities in determining whether citizenship should be revoked. This is the view adopted by the District Court but rejected by the Court of Appeals. It is true, as petitioner notes, that this Court has held that a denaturalization action is a suit in equity. *Knauer* v. *United States,* 328 U. S. 654, 671 (1946); *Luria* v. *United States, supra,* at 27–28. Petitioner further points to numerous cases in which the courts have exercised discretion in determining whether citizenship should be granted. See, *e. g., In re Iwanenko's Petition,* 145 F. Supp. 838 (ND Ill. 1956); *Petition of R.,* 56 F. Supp. 969 (Mass. 1944). Petitioner would therefore have us conclude that similar discretion should be available to a denaturalization court to weigh the equities in light of all the circumstances in order to arrive at a solution that is just and fair. He then argues that if such power exists, the facts of this case, particularly his record of good conduct over the past 29 years and the reasonable doubts about some of the allegations in the Government's complaint, all weigh in favor of permitting him to retain his citizenship. Although petitioner presents this argument with respect to revocation of citizenship procured through willful misrepresentation of material facts, we assume that petitioner believes that courts should also be allowed to weigh the equities in

_____

is illegally procured if "some statutory requirement which is a condition precedent to naturalization is absent at the time the petition [for naturalization is] granted").

deciding whether to revoke citizenship that was "illegally procured," which is our holding in this case.

We agree with the Court of Appeals that district courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of material facts. Petitioner is correct in noting that courts necessarily and properly exercise discretion in characterizing certain facts while determining whether an applicant for citizenship meets some of the requirements for naturalization.[39] But that limited discretion does not include the authority to excuse illegal or fraudulent procurement of citizenship. As the Court of Appeals stated: "Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship." 597 F. 2d, at 954. By the same token, once a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct. Indeed, contrary to the District Court's suggestion, see *supra*, at 503, this issue had been settled by prior decisions of this Court. In case after case, we have rejected lower court efforts to moderate or otherwise avoid the statutory mandate of Congress in denaturalization proceedings. For example, in *United States* v. *Ness*, 245 U. S. 319 (1917), we ordered the denaturalization of an individual who "possessed the personal qualifications which entitle aliens to admission and to citizenship," *id.*, at 321, but who had failed to file a certificate of arrival as required by statute. We explained that there was "no power . . . vested in the naturalization court to dispense with" this requirement.

---

[39] Courts must consider the facts and circumstances in deciding whether an applicant satisfies such requirements for naturalization as good moral character and an understanding of the English language, American history, and civics. See 8 U. S. C. §§ 1423, 1427 (d).

*Id.,* at 324. We repeat here what we said in one of these earlier cases:

> "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon the terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare. *United States* v. *Ginsberg,* 243 U. S., at 474–475.

See *Maney* v. *United States,* 278 U. S., at 22–23; *Johannessen* v. *United States,* 225 U. S., at 241–242.

In sum, we hold that petitioner's citizenship must be revoked under 8 U. S. C. § 1451 (a) because it was illegally procured. Accordingly, the judgment of the Court of Appeals is affirmed.[40]

*So ordered.*

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE BLACKMUN, concurring in the judgment.

I agree with much of the Court's reasoning as well as with the result it reaches. I am perplexed, however, by the Court's reluctance, *ante,* at 508–509, to apply the materiality standard of *Chaunt* v. *United States,* 364 U. S. 350 (1960), to petitioner's circumstances. I write separately to express my understanding that application of *Chaunt* would yield no different result here and to state my belief that a standard as rigorous as *Chaunt*'s is necessary to protect the rights of our naturalized citizens.

In *Chaunt,* the issue presented was whether failure to reveal certain prior arrests in response to a question on a citizenship application form constituted misrepresentation or concealment

---

[40] Our decision makes it unnecessary to resolve the question whether the Court of Appeals correctly interpreted the materiality test enunciated in *Chaunt.*

of a material fact for purposes of the denaturalization statute.[1] *Id.*, at 351–352. As construed by *Chaunt,* the statute authorizes denaturalization on the basis of an applicant's failure to disclose suppressed facts which (1) "if known, would have warranted denial of citizenship," or (2) "might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." *Id.*, at 355.

The Court says that *Chaunt* need not be invoked when denaturalization is premised on deliberate misstatements at the *visa* application stage, but does not explain why this is so. I fail to see any relevant limitation in the *Chaunt* decision or the governing statute that bars *Chaunt*'s application to this case. By its terms, the denaturalization statute at the time of *Chaunt,* as now, was not restricted to any single stage of the citizenship process.[2] Although in *Chaunt* the nondisclosures arose in response to a question on a citizenship application form filed some years after the applicant first arrived in this country, nothing in the language or import of the opinion suggests that omissions or false statements should be assessed differently when they are tendered upon initial entry into this country. If such a distinction was intended, it has eluded the several courts that unquestioningly have applied *Chaunt*'s materiality standard when reviewing alleged distortions in the visa request process. See, *e. g., Kassab* v. *Immigration &*

---

[1] The statute is § 340 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, as amended, 8 U. S. C. § 1451 (a). Its relevant provisions are quoted *ante,* at 493, n. 1.

[2] Except for the prohibition against "illegally procured" citizenship, added in 1961 by Pub. L. 87–301, § 18 (a), 75 Stat. 656, the statute today is unchanged from the version considered in *Chaunt.* Now, as then, it authorizes the initiation of denaturalization proceedings should the Government discover that the order admitting a person to citizenship was "procured by concealment of a material fact or by willful misrepresentation." In accord with the Court's prior construction of this phrase, both the concealment and the misrepresentation must be willful, and each must also relate to a material fact. *Ante,* at 507–508, n. 28, citing *Costello* v. *United States,* 365 U. S. 265, 271–272, n. 3 (1961).

*Naturalization Service,* 364 F. 2d 806 (CA6 1966); *United States* v. *Rossi,* 299 F. 2d 650 (CA9 1962); *Langhammer* v. *Hamilton,* 295 F. 2d 642 (CA1 1961).

I doubt that the failure of these courts to raise any question about the relevance of *Chaunt* was an oversight. It is far from clear to me that the materiality of facts should vary because of the time at which they are concealed or misrepresented. Nor do I see why the events or activities underlying these facts become more or less material depending upon the country in which they transpired.[3] In each context, the inquiry concerning nondisclosure addresses the same fundamental issue: did the applicant shield from review facts material to his eligibility for citizenship?

In *Chaunt,* the Court articulated two approaches to provide guidance and uniformity in such inquiries. The Court today adopts what it considers a new and minimal definition of materiality: it announces that a misrepresentation is material "if disclosure of the true facts would have made the applicant ineligible for a visa." *Ante,* at 509. This standard bears no small resemblance to the "first test" of *Chaunt,* for it too deems material those facts "which, if known, would have warranted denial of" eligibility. 364 U. S., at 355. Because I see no effective difference between the standards, nor any persuasive grounds for contriving a difference, I would rely explicitly upon the *Chaunt* test here and avoid risking

---

[3] This discussion of materiality relates only to proceedings brought by the Government to *de*naturalize a United States citizen. I do not mean to suggest that, for purposes of *attaining* citizenship, a misrepresentation must be analyzed in an identical fashion. The immigration law historically has afforded greater protections to persons already admitted to citizenship than to those seeking to obtain its privileges and benefits. This choice, however, reflects a judgment that the weighty interest in citizenship should be neither casually conferred nor lightly revoked. See *Berenyi* v. *District Director,* 385 U. S. 630, 636–637 (1967). In view of petitioner's status as a United States citizen, it is unnecessary to consider here the question of materiality at the naturalization stage.

the confusion that is likely to be engendered by multiple standards.[4]

Application of *Chaunt* to the instant record would not result in any significant departure from the Court's basic analysis. As the Court notes, *ante,* at 500, petitioner admitted at trial that he deliberately misrepresented his wartime activities and whereabouts when communicating with representatives of the Displaced Persons Commission during the visa application process. Record 1518–1522.[5] The expert testimony of former Vice Consul Jenkins demonstrates convincingly that an applicant who had served as a concentration camp guard would not have qualified for a displaced person's visa.[6] The determination to exclude persons who had assisted in persecuting civilians was grounded in a clear statutory mandate,[7] and uncontroverted testimony established that

---

[4] Confusion to some extent is already present. We granted certiorari in this case primarily to resolve conflicting interpretations of the *Chaunt* materiality standard. Compare *United States* v. *Riela,* 337 F. 2d 986 (CA3 1964), and *United States* v. *Rossi,* 299 F. 2d 650 (CA9 1962), with *Kassab* v. *Immigration & Naturalization Service,* 364 F. 2d 806 (CA6 1966), and *Langhammer* v. *Hamilton,* 295 F. 2d 642 (CA1 1961).

[5] JUSTICE WHITE's observation in dissent, *post,* at 529, and n. 10, is not to the contrary. The District Court found a lack of willfulness with respect to the nondisclosure on petitioner's citizenship application form, completed in 1969. As the Court correctly observes, *ante,* at 507, n. 26, petitioner's misrepresentations at the visa application stage were plainly willful.

[6] Record 766–768, 822–823, substantially reproduced, *ante,* at 510–511, n. 31. Jenkins further testified at length that, based on his knowledge and experience, "involuntary" guard service in Nazi concentration camps was unknown and virtually inconceivable. Record 754–758, 807–808, 823–824. While I find much of this testimony persuasive, I do not need to rely upon it here since petitioner's ineligibility for a visa is independently established. See nn. 7 and 8, *infra.*

[7] The Displaced Persons Act, 62 Stat. 1009, enabled refugees driven from their homelands during and after World War II to emigrate to the United States without regard to traditional immigration quotas. Eligibility was extended consistent with requirements set forth in Annex I to

the statute was consistently applied in just this fashion against individuals in petitioner's position.[8]  Under these circumstances, I agree with the Court that petitioner's true activities, if known, would certainly have warranted denial of his visa application.  Without a valid visa, petitioner could not have been considered for status as a United States citizen.  Having proved this much by clear and convincing evidence, the Government has satisfied the first test of *Chaunt.*

This test strikes a careful and necessary balance between the Government's commitment to supervising the citizenship process and the naturalized citizen's interest in preserving his status.  The individual seeks to retain his citizenship right to full and equal status in our national community, a right conferring benefits of inestimable value upon those who possess it.  The freedoms and opportunities secured by United States citizenship long have been treasured by persons fortunate enough to be born with them, and are yearned for by countless less fortunate.  Indeed, citizenship has been described as "man's basic right for it is nothing less than the right to have rights." [9] and the effects of its loss justly have been called "more serious than a taking of one's property, or

---

the Constitution of the International Refugee Organization of the United Nations.  This excluded the following displaced persons from its ambit of concern:

"1. War criminals, quislings and traitors.

"2. Any other persons who can be shown:

"(*a*) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

"(*b*) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Part II, 62 Stat. 3051–3052.

[8] Record 766–768.  See also *id.,* at 790 (concentration camp guards themselves understood that admission of their former status, without more, was enough to render them ineligible).

[9] *Perez* v. *Brownell,* 356 U. S. 44, 64 (1958) (Warren, C. J., dissenting).

the imposition of a fine or other penalty." [10]   Where, as here, the Government seeks to revoke this right, the Court consistently and forcefully has held that it may do so only on scrupulously clear justification and proof.   *Costello* v. *United States,* 365 U. S. 265 (1961); *Nowak* v. *United States,* 356 U. S. 660 (1958); *Knauer* v. *United States,* 328 U. S. 654 (1946); *Baumgartner* v. *United States,* 322 U. S. 665 (1944); *Schneiderman* v. *United States,* 320 U. S. 118 (1943).   Before sustaining any decision to impose the grave consequences of denaturalization, the Court has regarded it as its duty "to scrutinize the record with the utmost care," [11] construing "the facts and the law . . . as far as is reasonably possible in favor of the citizen." [12]

The *Chaunt* decision is properly attentive to this long-recognized unique interest in citizenship, and I must join the Court in not accepting the reasoning of the Court of Appeals, which would have diluted the materiality standard.   The Court of Appeals reasoned that materiality was established if the nondisclosed facts would have triggered an inquiry that might have uncovered other unproved and disqualifying facts.   See 597 F. 2d 946, 950–951 (CA5 1979).   By concluding that the Government has demonstrated the actual existence of disqualifying facts—facts that themselves would have warranted denial of petitioner's citizenship—this Court adheres to a more rigorous standard of proof.   I believe that *Chaunt* indeed contemplated only this rigorous standard, and I suspect the Court's reluctance explicitly to apply it stems from a desire to sidestep the confusion over whether *Chaunt* created more than one standard.

*Chaunt,* to be sure, did announce a disjunctive approach to the inquiry into materiality, but several factors support the conclusion that under either "test" the Government's

---

[10] *Schneiderman* v. *United States,* 320 U. S. 118, 122 (1943).

[11] *Nowak* v. *United States,* 356 U. S. 660, 663 (1958).

[12] *Schneiderman* v. *United States,* 320 U. S., at 122.

task is the same: it must prove the existence of disqualifying facts, not simply facts that might lead to hypothesized disqualifying facts. First, this Court's reasoning before *Chaunt* contains no suggestion that a naturalized citizen would be reduced to alien status merely because a thwarted Government inquiry *might* have shown him to be unqualified. Instead, the Court has been willing to approve denaturalization only upon a clear and convincing showing that the prescribed statutory conditions of citizenship had never been met. This, it seems to me, is the clear import of the Court's exhaustive reviews in *Nowak* v. *United States* 356 U. S., at 663–668; *Knauer* v. *United States,* 328 U. S., at 656–669; *Baumgartner* v. *United States,* 322 U. S., at 666–678; and *Schneiderman* v. *United States,* 320 U. S., at 131–159. Of course, the Government's ability to investigate with vigor may be affected adversely by its inability to discover that certain facts have been suppressed. The standard announced by the Court of Appeals, however, seems to me to transform this interest in unhampered investigation into an end in itself. Application of that court's standard suggests that a deliberately false answer to any question the Government deems worth asking may be considered material. I do not believe that such a weak standard of proof was ever contemplated by this Court's decisions prior to *Chaunt.*

Instead, I conclude that the Court in *Chaunt* intended to follow its earlier cases, and that its "two tests" are simply two methods by which the existence of ultimate disqualifying facts might be proved. This reading of *Chaunt* is consistent with the actual language of the so-called second test; [13] it

---

[13] Under the "second test" in *Chaunt,* the Government is required to prove with respect to suppressed facts "that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." 364 U. S., at 355. The Court of Appeals in effect construes the word "possibly" to modify the entire following phrase. I believe the sounder construction is that adopted by the District Court, see 455 F. Supp. 893, 915–916 (SD Fla. 1978), whereby

also appears to be the meaning that the dissent in *Chaunt* believed the Court to have intended.[14]

Significantly, this view accords with the policy considerations informing the Court's decisions in the area of denaturalization. If naturalization can be revoked years or decades after it is conferred, on the mere suspicion that cer-

---

the word "possibly" modifies only the first part of the ensuing phrase. Because what would "possibly" be discovered is *not* "facts which *might* warrant denial of citizenship" but *"other* facts warranting denial of citizenship" (emphasis supplied), the "second test" simply asks whether knowledge of the suppressed facts could have enabled the Government to reach the ultimate disqualifying facts whose existence is now known. See also 364 U. S., at 353 (second test stated as whether "disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship").

[14] The dissent in *Chaunt* proposed its own standard, which it apparently believed was *at odds* with what the Court had adopted:

"The test is not whether the truthful answer in itself, or the facts discovered through an investigation prompted by that answer, would have justified a denial of citizenship. It is whether the falsification, by misleading the examining officer, forestalled an investigation which *might have resulted* in the defeat of petitioner's application for naturalization." *Id.,* at 357. (Emphasis in original.)

The dissent also voiced concern that the Court, by imposing such a heavy burden of proof on the Government in denaturalization proceedings, in effect would invite dishonesty from future applicants for citizenship. *Ibid.* JUSTICE WHITE in dissent today expresses the same concern. *Post,* at 529. It of course is never easy to demonstrate the existence of statements or events that occurred long ago. Records and witnesses disappear, memories fade, and even the actor's personal knowledge becomes less reliable. While recognizing the arduous nature of the task, the Court nonetheless has insisted that the Government meet a very high standard of proof in denaturalization proceedings. *Chaunt's* rigorous definition of materiality, it is true, may occasionally benefit an applicant who conceals disqualifying information. Yet, practically and constitutionally, naturalized citizens as a class are not less trustworthy or reliable than the native-born. The procedural protection of the high standard of proof is necessary to assure the naturalized citizen his right, equally with the native-born, to enjoy the benefits of citizenship in confidence and without fear.

tain undisclosed facts *might* have warranted exclusion, I fear that the valued rights of citizenship are in danger of erosion. If the weaker standard were employed, I doubt that the denaturalization process would remain as careful as it has been in the past in situations where a citizen's allegedly material misstatements were closely tied to his expression of political beliefs or activities implicating the First Amendment.[15]   Citizenship determinations continue to involve judgments about a person's "good moral character" or his attachment "to the principles of the Constitution," see 8 U. S. C. § 1427 (a), and the judiciary's task remains the difficult one of balancing a need to safeguard admission to United States citizenship, in accord with the will of Congress, against a citizen's right to feel secure in the exercise of his constitutional freedoms.   By concluding that an impaired investigation may justify the loss of these freedoms, the Court of Appeals threatens to leave the naturalized citizen with "nothing more than citizenship in attenuated, if not suspended, animation." [16] The Court seems to reject this approach, and follows the essential teaching of *Chaunt*.   I regret only its unwillingness to say so.

JUSTICE WHITE, dissenting.

The primary issue presented in the petition for certiorari was whether the Court of Appeals had properly interpreted the test articulated in *Chaunt* v. *United States*, 364 U. S. 350 (1960), for determining whether an individual procured his citizenship by concealment or misrepresentation of a "material" fact.   In *Chaunt* the Government sought to revoke an

---

[15] Chaunt's prior activities involved distributing handbills and speaking in a public park, activities that merit a high degree of First Amendment protection.   See also *Schneiderman* v. *United States, supra* (membership in Communist Party in the United States); *Nowak* v. *United States, supra* (same).

[16] *Schneiderman* v. *United States,* 320 U. S., at 166 (Rutledge, J., concurring).

individual's citizenship because he had not disclosed certain facts in his application for citizenship.[1] Although *Chaunt* did not address the standard of materiality with respect to visa applications, the parties before this Court have assumed that the *Chaunt* test should be used to determine whether petitioner concealed material facts when he applied for a visa.[2]

Recognizing that the relevance of *Chaunt* to visa applications may be problematic, the majority turns to a wholly separate ground to decide this case, resting its decision on its interpretation of "adopted" § 2 (a) of the Displaced Persons Act (see *ante,* at 510, n. 31). I am reluctant to resolve the issue of whether *Chaunt* extends to visa applications, since the parties have neither briefed nor argued the point. However, I am equally reluctant to adopt the course chosen by the majority, for the language of § 2 (a) is not entirely unambiguous,[3] and the parties have not addressed the proper interpretation of the statute.[4] Under these circumstances, I would

---

[1] Section 340 (a) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1451 (a), quoted in pertinent part in the majority opinion, *ante,* at 493, n. 1, directs the Government to seek revocation of citizenship that was "procured by concealment of a material fact or by willful misrepresentation."

[2] Similarly, both the District Court and the Court of Appeals assumed that the *Chaunt* materiality test should be applied to the Government's claim that petitioner concealed material information when he applied for a visa.

[3] The majority asserts that the plain language of the statute compels the conclusion that § 2 (a) excluded all those who assisted the enemy in persecuting civil populations, even those who involuntarily assisted the enemy. The majority explains in a footnote that under § 2 (a) one must focus on whether the individual assisted the enemy in *persecuting* civil populations, *ante,* at 512–513, n. 34, rather than focusing on voluntariness. Yet one could argue that the words "assist" and "persecute" suggest that § 2 (a) would not apply to an individual whose actions were truly coerced.

[4] The Government did not contend that § 2 (a) of the Displaced Persons Act should be interpreted as excluding persons who *involuntarily* assisted the enemy in persecuting civil populations. Rather, it argued that the

simply clarify the *Chaunt* materiality test and then remand to the Court of Appeals to review the District Court's findings on petitioner's concealment at the time he applied for citizenship.

In *Chaunt* the Court stated that to prove misrepresentation or concealment of a material fact the Government must prove by clear and convincing evidence

> "either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." 364 U. S., at 355.[5]

Under the District Court's interpretation of the second *Chaunt* test and that urged by petitioner, the Government would be required to prove that an investigation prompted by a complete, truthful response *would have* revealed facts justifying denial of citizenship.[6] The Court of Appeals and the Government contend that under the second *Chaunt* test the Government must prove only that such an investigation *might have* led to the discovery of facts justifying denial of citizenship.[7] In my opinion, the latter interpretation is correct.[8]

---

finding that petitioner had "involuntarily" served as a concentration camp guard was clearly erroneous. It therefore urged us to affirm on the ground that the first *Chaunt* test had been satisfied.

[5] In *Chaunt* the Court also observed that complete, honest replies to all relevant questions are essential, not only because concealed facts might in and of themselves justify denial of citizenship but also because "disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship." 364 U. S., at 352–353.

[6] 455 F. Supp. 893, 915–916 (SD Fla. 1978).

[7] 597 F. 2d 946, 951 (CA5 1979).

[8] The Government should be required to prove that an investigation would have occurred if a truthful response had been given, and that the investigation might have uncovered facts justifying denial of citizenship. The defendant could rebut the Government's showing that the investigation might have led to the discovery of facts justifying denial of citizenship by establishing that the underlying facts would not have justified denial of citizenship.

If the District Court's interpretation were adopted, the Government would bear the heavy, and in many cases impossible, burden of proving the true facts that existed many years prior to the time the defendant applied for citizenship, whether it proceeded under the first or the second *Chaunt* test. This definition of "materiality," by greatly improving the odds that concealment would be successful, would encourage applicants to withhold information, since the Government would often be unable to meet its burden by the time the concealment was discovered.

In this case, the Government alleged that when petitioner filled out his application for citizenship, he willfully concealed that he had served as an armed guard for the Germans during the war. Petitioner failed to disclose this information, although the application form required him to list his past or present membership in any organization in the United States or elsewhere, including foreign military service. Although the Government produced evidence to support a finding of materiality under its interpretation of the second *Chaunt* test,[9] the District Court concluded that petitioner's service as an armed guard for the Germans was immaterial under the District Court's interpretation of *Chaunt*. It also found that the nondisclosure was not willful.[10]

---

[9] The naturalization examiner who processed petitioner's application testified at trial that if petitioner had disclosed his service as an armed guard with the Germans during the war, the examiner would not have made any recommendation regarding petitioner's application for citizenship until an investigation had been conducted. He also testified that if the investigation had disclosed that petitioner had physicially hurt Jewish prisoners while serving as a guard at Treblinka, the examiner would have recommended that petitioner's application for citizenship be denied, either on the ground that petitioner lacked good moral character or on the ground that he had not been properly admitted into the United States. Waterbury, Conn., Trial Transcript 147–148.

[10] The District Court decided that petitioner's failure to disclose that he had served as an armed guard for the Germans was not willful, since "there would be strong reason in [petitioner's] mind to view himself as a prisoner of war." 455 F. Supp., at 917.

The Court of Appeals failed to review this portion of the District Court's opinion. Instead, it focused solely on whether petitioner had willfully concealed or misrepresented material facts when he applied for a visa. Therefore, I would vacate the judgment of the Court of Appeals and remand the case to that court to review the District Court's application of the *Chaunt* test to petitioner's concealment at the time he applied for citizenship.[11]

JUSTICE STEVENS, dissenting.

The story of this litigation is depressing. The Government failed to prove its right to relief on any of several theories advanced in the District Court. The Court of Appeals reversed on an untenable ground. Today this Court affirms on a theory that no litigant argued, that the Government expressly disavowed, and that may jeopardize the citizenship of countless survivors of Nazi concentration camps.

The seven-count complaint filed by the Government in the District Court prayed for a revocation of petitioner's citizenship on four different theories: (1) that his entry visa was invalid because he had misstated his birthplace and place of residence and therefore he had never been lawfully admitted to the United States; (2) that he committed war crimes or atrocities and therefore was not eligible for admission as a displaced person; (3) that he made material misstatements on his application for citizenship in 1970; and (4) that he was not a person of good moral character when he received his American citizenship. After a long trial, the District Court concluded that the Government had failed to prove its case.

The trial judge was apparently convinced that the suggestive identification procedures endorsed by the prosecution

---

[11] I agree with the majority's view that a district court does not have discretion to weigh equitable considerations in determining whether citizenship should be revoked.

had resulted in a misidentification of petitioner; that petitioner had not performed the atrocious acts witnessed by the survivors of Treblinka who testified;[1] that Vice Consul Jenkins' testimony was not entirely reliable;[2] and that for the most part petitioner was a truthful witness. 455 F. Supp. 893, 906–909. The District Judge specifically found that petitioner's visa was valid and that petitioner therefore lawfully entered the United States, *id.*, at 916; that his service at Treblinka was involuntary, *id.*, at 914; that he made no misstatements in his application for citizenship, *id.*, at 917; and that he was a person of good moral character. *Ibid.*

---

[1] The District Judge's opinion contains a suggestion that the witnesses' identification of petitioner may have been a case of mistaken identity inasmuch as petitioner resembled another guard who had a position of greater authority. See 455 F. Supp. 893, 908.

[2] In view of the extensive references to Jenkins in the Court's opinion, some of the District Court's observations should be quoted:

"Unfortunately, and inexplicably, the Government did not find the Vice-Consul who approved defendant's application.

.         .         .         .         .

"Jenkins' testimony about the structure of the death camp organization was hardly expert and conflicts consistently with other evidence presented at the trial. For example, he testified that the Ukrainian guards had the same uniforms as the SS with only slightly different insignia. However, the unanimous testimony was the Germans wore their usual gray-green uniforms but the prisoner-guards didn't. He testified that the camp guards could get leave and get away from the camp and could transfer. The testimony was clear that they could not take leave (and go to Berlin, as Jenkins opined) but could only get a two-to-four-hour pass to visit a small village a couple of miles away.

.         .         .         .         .

"Jenkins also would have considered the kapos as excludable because they assisted the Germans. This is totally contrary to the reaction of every witness who survived Treblinka; each of the Israeli witnesses testified the kapos did only what they had to do and the witnesses were quite indignant when asked if they had ever testified against the kapos. The witnesses replied that there was no reason to do so. In addition, Jenkins speculated that the kapos were probably shot in 1945 during a period of retaliation, but the testimony was to the contrary." *Id.*, at 911–913.

As an alternative basis for decision, the District Court concluded that because the Government had failed to prove that petitioner committed any atrocities at Treblinka, his record as a responsible and law-abiding resident of the United States for 29 years provided an equitable ground for refusing to revoke his citizenship. *Id.,* at 918–920.

The Court of Appeals reversed, holding that the District Court committed two errors of law. 597 F. 2d 946. First, the Court of Appeals held that the District Court in assessing the materiality of the misstatement in petitioner's 1949 visa application had misapplied this Court's decision in *Chaunt* v. *United States,* 364 U. S. 355; second, the Court of Appeals rejected the equitable basis for the District Court's judgment. The Court of Appeals did not, however, disturb any of the District Court's findings of fact.

Today the Court declines to endorse the Court of Appeals' first rationale. Because the *Chaunt* test was formulated in the context of applications for citizenship, and because the only misstatements here were made on petitioner's visa application,[3] the Court acknowledges that the *Chaunt* test is not

---

[3] In Count 4 of its complaint the Government alleged that petitioner did not truthfully answer the question on his citizenship application whether he had ever committed a crime. Having found that his service in Treblinka was not voluntary, the District Court concluded that petitioner's negative answer was truthful. In Count 5 of its complaint (as amended at a pretrial conference) the Government alleged that petitioner had a duty to disclose his guard service at Treblinka in answer to the following question:

"7. List your present and past membership in every organization, association, fund, foundation, party, club, society, or similar group in the United States and in any other place, and your foreign military service."

The District Court concluded that because petitioner regarded himself as a prisoner of war, and because he had listed his Russian military service, this omission could not be considered willful. See *id.,* at 917. That conclusion was certainly permissible; indeed it is arguable that the Treblinka guard service was neither the sort of "membership" in a club or organization nor the sort of "military service" that the question contemplated.

automatically applicable. The Court does not reach the question of the applicability of *Chaunt* in the visa context, however, because it concludes that at the very least a misrepresentation is material if disclosure of the true facts would have rendered the applicant ineligible for a visa. Because the Court holds as a matter of law that petitioner's service as a guard at Treblinka, whether or not voluntary, made him ineligible for a visa, petitioner was not legally admitted to the country and hence was not entitled to citizenship.

I cannot accept the view that any citizen's past involuntary conduct can provide the basis for stripping him of his American citizenship. The Court's contrary holding today rests entirely on its construction of the Displaced Persons Act of 1948 (DPA). Although the Court purports to consider the materiality of petitioner's misstatements, the Court's construction of the DPA renders those misstatements entirely irrelevant to the decision of this case. Every person who entered the United States pursuant to the authority granted by that statute, who subsequently acquired American citizenship, and who can be shown "to have assisted the enemy in persecuting civil populations"—even under the most severe duress—has no right to retain his or her citizenship. I believe that the Court's construction of the DPA is erroneous and that the Court of Appeals misapplied the *Chaunt* test.

## I

Section 2 (a) of the DPA was "adopted" from the Constitution of the International Refugee Organization (see *ante,* at 510, n. 31), which described in Part II of Annex I "Persons who will not be [considered as displaced persons]." The second listing had two classifications:

"2. Any other persons who can be shown:

"(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

"(b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations."

The District Court recognized that the section dealing with assisting enemy forces contained the word "voluntarily," while the section dealing with persecuting enemy populations did not. The District Court refused to construe the statute to bar relief to any person who assisted the enemy, whether voluntarily or not, however, because such a construction would have excluded the Jewish prisoners who assisted the SS in the operation of the concentration camp. 455 F. Supp., at 913. These prisoners performed such tasks as cutting the hair of female prisoners prior to their execution and performing in a camp orchestra as a ruse to conceal the true nature of the camp. I agree without hesitation with the District Court's conclusion that such prisoners did not perform their duties voluntarily and that such prisoners should not be considered excludable under the DPA.[4] The Court resolves the dilemma perceived by the District Court by concluding that prisoners who did no more than cut the hair of female inmates before they were executed could not be considered to be assisting the enemy in *persecuting* civilian populations. See *ante*, at 512–513, n. 34. Thus the Court would give the word "persecution" some not yet defined specially limited reading. In my opinion, the term "persecution" clearly applies to such conduct; indeed, it probably encompasses almost every aspect of life or death in a concentration camp.

The Court's resolution of this issue is particularly unper-

---

[4] One particular squad of Jewish prisoners was responsible for undressing the aged and infirm prisoners and leading them to the lazaret, the eternally burning pit, where they were shot. Record 287 (Kohn). One of the prisoners who worked in the camp stated when asked whether this squad "assist[ed] in bringing [prisoners] to their death": "We automatically assisted, all of us, but . . . it was under the fear and terror." *Id.*, at 293 (Kohn).

suasive when applied to the "kapos," the Jewish prisoners who supervised the Jewish workers at the camp. According to witnesses who survived Treblinka, the kapos were commanded by the SS to administer beatings to the prisoners, and they did so with just enough force to make the beating appear realistic yet avoid injury to the prisoner. Record 293–295, 300–302 (Kohn), 237 (Turowski).[5] Even if we assume that the kapos were completely successful in deceiving the SS guards and that the beatings caused no injury to other inmates, I believe their conduct would have to be characterized as assisting in the persecution of other prisoners.[6] In my view, the reason that such conduct should not make the kapos ineligible for citizenship is that it surely was not voluntary. The fact that the Court's interpretation of the DPA would exclude a group whose actions were uniformly defended by survivors of Treblinka, id., at 236–239 (Turowski), 300 (Kohn), 1157–1159 (Epstein), merely underscores the strained reading the Court has given the statute.[7]

The Government was apparently persuaded by the force of the District Court's reasoning. In the Court of Appeals the Government unequivocally accepted the District Court's

---

[5] Two of the witnesses, Czarny and Boraks, testified that they did not recall or hear of any kapos beating prisoners, id., at 551, 686, and one witness, Epstein, did not see or hear of beatings inflicted by kapos. Id., at 1159.

[6] Moreover, the Court's distinction between the kapos and other Jewish workers on the one hand and the Ukranian guards on the other is based in large part on such factors as the issuance of a uniform and weapons, the receipt of a stipend, and the privilege of being allowed to leave the camp and visit a nearby village. These supposedly distinguishing factors are essentially unrelated to the persecution of the victims of the concentration camp.

[7] We also note that Vice Consul Jenkins, upon whose testimony the Court heavily relies, indicated that he would have considered kapos to be ineligible under the DPA if they could be proved to be "internal camp inmate collaborators." Id., at 828.

view that § 2 (a) should be construed to read "persons who can be shown to have *voluntarily* assisted the enemy." [8] The Government did not retreat from that concession before this Court.[9] The reasons for agreeing with the Government's interpretation of the statute are compelling.

## II

If the DPA is correctly construed, petitioner is entitled to retain his citizenship unless the Government proved that he made a material misstatement in his application for citizenship in 1970 or that he was ineligible for citizenship in 1970. Given the District Court's findings that he made no willful misstatement in 1970 and that he had not committed any crimes because his service at Treblinka was involuntary, the challenge to his citizenship rests entirely on the claim that he was not lawfully admitted to the United States in 1949 because he made material misstatements in his visa application. Even if the *Chaunt* test applies equally to visa applications and citizenship applications, I would hold that the Government failed to satisfy its burden under what I believe to be the proper interpretation of that test.

The Court and the parties seem to assume that the *Chaunt* test contains only two components: (1) whether a truthful answer might have or would have triggered an investigation, and (2) whether such an investigation might have or would

---

[8] Emphasis added. Footnote 11 on p. 17 of the Government's brief in the Court of Appeals states:

"The district court held that, in Section 2 (a), 'persons who can be shown to have assisted the enemy' should be construed to read 'persons who can be shown to have voluntarily assisted the enemy.' 455 F. Supp., at 913. The United States has no quarrel with such a construction in this case."

[9] Inasmuch as the Attorney General of the United States argued this case himself, presumably the decision not to question the District Court's construction of the statute was reached only after the matter had been reviewed with the utmost care.

have revealed a disqualifying circumstance. Under this characterization of the *Chaunt* test, the only dispute is what probability is required with respect to each of the two components. There are really three inquiries, however: (1) whether a truthful answer would have led to an investigation, (2) whether a disqualifying circumstance actually existed, and (3) whether it would have been discovered by the investigation. Regardless of whether the missstatement was made on an application for a visa or for citizenship, in my opinion the proper analysis should focus on the first and second components and attach little or no weight to the third. Unless the Government can prove the existence of a circumstance that would have disqualified the applicant, I do not believe that citizenship should be revoked on the basis of speculation about what might have been discovered if an investigation had been initiated. But if the Government can establish the existence of a disqualifying fact, I would consider a willful misstatement material if it were more probable than not that a truthful answer would have prompted more inquiry. Thus I would presume that an investigation, if begun at the time that the misstatement was made, would have been successful in finding whatever the Government is now able to prove. But if the Government is not able to prove the existence of facts that would have made the resident alien ineligible for citizenship at the time he executed his application, I would not denaturalize him on the basis of speculation about what might have been true years ago.

The Government in this case failed to prove that petitioner materially misrepresented facts on his citizenship application. Because I do not believe that "adopted" § 2 (a) of the DPA applies to persons whose assistance in the persecution of civilian populations was involuntary, and because the District Court found that petitioner's service was not voluntary, it necessarily follows that the Government failed to prove the existence of a disqualifying circumstance with respect to peti-

tioner's visa application.[10]   The misstatements in that application were therefore not material under a proper application of *Chaunt.*

The gruesome facts recited in this record create what Justice Holmes described as a sort of "hydraulic pressure" that tends to distort our judgment.   Perhaps my refusal to acquiesce in the conclusion reached by highly respected colleagues is attributable in part to an overreaction to that pressure.   Even after recognizing and discounting that factor, however, I remain firmly convinced that the Court has committed the profoundest sort of error by venturing into the unknown to find a basis for affirming the judgment of the Court of Appeals.   That human suffering will be a consequence of today's venture is certainly predictable; that any suffering will be allayed or avoided is at best doubtful.

I respectfully dissent.

---

[10] Under my interpretation of the *Chaunt* test, the Government should not prevail on the speculation that it might have been able to uncover evidence that petitioner committed war crimes while at Treblinka.   Similarly, I would hold that the District Court's findings with respect to willfulness of alleged misstatements on petitioner's citizenship application were not clearly erroneous.   See n. 2, *supra.*   I surely would not rest decision in this Court on a *de novo* evaluation of the testimony of the witness Jenkins rather than the findings of the District Court.