**UNITED STATES of America,
Plaintiff,**

v.

**Vladas ZAJANCKAUSKAS, a/k/a Vladas Zajančkauskas, a/k/a Vladislovas Zajančkauskas, a/k/a Vladas Zak, Defendant.**

**No. CIV.A.02–40107–NMG.**

United States District Court,
D. Massachusetts.

Jan. 26, 2005.

Mark J. Grady, United States Attorney's Office, Boston, MA, William Henry Kenety, V, Jeffrey L. Menkin, Office of Special Investigations, Criminal Division, U.S. Department of Justice, Washington, DC, Michael J. Sullivan, United States Attorney's Office, Boston, MA, for USA.

Thomas J. Butters, Butters Brazilian LLP, Boston, MA, Robert L. Sheketoff, Boston, MA, Matthew D. Thompson, Butters, Brazilian & Small LLP, Boston, MA, for Vladas Zajanckauskas.

## MEMORANDUM OF DECISION

GORTON, District Judge.

On June 5, 2002, the United States ("the government") commenced this civil action against Vladas Zajanckauskas ("Zajanckauskas") alleging that he made materially false statements on his visa application in connection with his immigration into the United States. Pursuant to 8 U.S.C. § 1451, the government now seeks a judgment declaring revocation of his citizenship and cancellation of his Certificate of Naturalization. The parties appeared for trial before this Court, sitting without a jury, on January 10, 2005, and two subsequent trial days. The Court now announces its findings of fact and conclusions of law.

## I. *Findings of Fact*

The parties stipulated to a number of facts and legal conclusions which narrowed the issues at trial and facilitated a focused presentation of the evidence. Keeping with that approach, the Court briefly summarizes the stipulations and then proceeds to consider the essence of the dispute.

Zajanckauskas was born on December 27, 1915 in Lithuania. On May 1, 1939, he was inducted into the Lithuanian Army and soon thereafter Lithuania was invaded by and subjugated to the Soviet Union and his unit became part of the Soviet Army. Within another year, Nazi Germany invaded Soviet Lithuania and Zajanckauskas was captured by the Germans on July 10, 1941. After spending some time in a German prisoner of war camp, Zajanckauskas was recruited to serve in the German Army and was sent to the Trawniki Training Camp ("Trawniki"). He arrived there on July 23, 1942, and received Trawniki Identification Number 2122.

In April, 1943, the Germans began the final liquidation of the Jewish Ghetto population in Warsaw, Poland using a combination of German armed forces, police and Trawniki guards. Zajanckauskas was stationed at Trawniki when troops were deployed from that camp to Warsaw and the sole disputed issue in this case is whether Zajanckauskas actually went to Warsaw as part of that deployment.

The parties have agreed that if Zajanckauskas went to Warsaw, his United States citizenship was illegally procured. If he did not go to Warsaw, his citizenship is valid. The Court accepts the parties' stipulations and resolves the disputed issue of fact in the following numbered paragraphs.

### A. Testimonial Evidence

1. The government offered the expert testimony of Dr. Peter R. Black, the Di-

rector of the Office of the Senior Historian at the Center for Advanced Holocaust Studies of the United States Holocaust Memorial Museum ("Dr.Black"). Although the Court does not accept Dr. Black's contention of complete impartiality, it finds that his testimony was generally informative and reliable and, to a large extent, his conclusions were firmly supported by documentary evidence, leaving no appearance of undue bias. Where the Court disagrees with Dr. Black's specific conclusions, it is noted below. On balance, his testimony was credible and his conclusions weigh in the Court's judgment of the facts.

2. The government also offered the testimony of Samuel Hilton ("Hilton"), a survivor of the liquidation of the Warsaw Ghetto. Mr. Hilton confirmed the validity of many of the parties' stipulations concerning conditions in Warsaw but his testimony was not probative of whether Zajanckauskas was deployed to Warsaw.

3. The government called Zajanckauskas to testify. He described his experiences at Trawniki and denied that he went to Warsaw in April, 1943. His testimony was not credible because it was largely irreconcilable with other evidence, including the testimony of Dr. Black concerning the treatment of Trawniki recruits ("Trawniki men"), descriptions of training at Trawniki contained in transcripts of Russian interrogations of captured Trawniki men ("interrogation protocols"), the defendant's own prior testimony and because his testimony defied reason and common sense.

4. Moreover, Zajanckauskas was not credible when he claimed that he was not paid for his service in the German Army, that he only handled a rifle (unloaded) for several days in order to perform marching drills and that he received no training in Nazi ideology. The evidence shows that, to the contrary, Trawniki men were paid, trained with (and used) rifles and received ideological training. In general, the German Army treated Trawniki men like German soldiers and Zajanckauskas went to great lengths to understate his training and service in his testimony.

5. The Court disbelieves Zajanckauskas's testimony that, on the days when thousands of Jews were being murdered at Trawniki, he was unaware of what was happening. That testimony is implausible because the executions took place within one hundred yards of the canteen where he claims he worked and the bodies of the dead were burned afterward at the camp for several days, creating what must have been horrific activity and odor. Indeed, the evidence showed that even townspeople, several miles away, became well aware of the carnage.

6. Zajanckauskas admitted that he had lied on his visa application insofar as he did not disclose his service at Trawniki and, although the parties have stipulated that his failure to disclose that service is not grounds for denaturalization, when Zajanckauskas was asked whether he would lie again to stay in the United States, he replied "I think so". On the basis of the entirety of Zajanckauskas's testimony, the Court accords it no credence.

7. Zajanckauskas offered the deposition testimony of his wife, Vladislava Zajanckauskas ("Vladislava"), and of his brother-in-law, Jozef Peter Kowalcyk ("Kowalcyk")(collectively "the supporting depositions"). The Court finds the supporting depositions largely incredible. Vladislava has a history of lying on her husband's behalf: she falsified her place of birth (the Village of Trawniki) on her application for a United States visa in an effort to hide her husband's German military service. Kowalcyk, likewise, has offered several different stories concerning

Zajanckauskas's whereabouts at various times, suggesting that he is either lying or that his memory is seriously flawed. His deposition affords evidence of the latter.

8. To the extent that the supporting depositions are credible, they are unhelpful insofar as neither witness has sufficient personal knowledge to say what Zajanckauskas did during the war or where he went while stationed at Trawniki. They offer only approximate times of when Zajanckauskas was visiting them (and thus not in Warsaw) which do not resolve the issue of the defendant's deployment to that city. The depositions are, therefore, accorded little weight.

### B. Zajanckauskas's Training at Trawniki

9. Trawniki was designed to house and train recruits as guards for use by the Nazi German Armed Forces. Trawniki men were recruited from various countries in Eastern Europe and many recruits began as German prisoners of war. Recruits received training in military drill and rifle use, guarding of prisoners and Nazi ideology. The recruits were also often sent to a school for non-commissioned officers ("NCO school") where they received additional training and promotions upon graduation. The recruits were paid, were permitted to go on leave and, if they were killed, their families received a benefit.

10. Zajanckauskas became a "Trawniki man" in July, 1942 and was accorded the rank of Wachmann (guard private). He attended NCO school and his Trawniki Personnel File indicates that he was promoted to Oberwachmann (guard private first class), then to Gruppenwachmann (guard sergeant) and finally to Zugwachmann (guard staff sergeant) within approximately 18 months. Although promotions were generally awarded on the basis of merit, it remains unclear why Zajanckaus-

kas was promoted and the Court draws no conclusions about his service based upon his promotions.

11. Just as with other Trawniki men, the Court finds that Zajanckauskas was paid and was granted leave. He took a short leave during February, 1943, to return to Lithuania. As a result of his attendance at NCO school, he received training in the use of firearms and Nazi ideology.

12. Based upon information contained in interrogation protocols, Zajanckauskas spent time working for the Trawniki Camp canteen as a purchaser of food and beverages. There is no credible evidence, however, from which to determine exactly when Zajanckauskas began working in that role or whether it was his exclusive role at Trawniki.

13. Defendant's contention, through counsel, that his linguistic skills (i.e. fluency in the local language) made him valuable to the Germans as a purchaser of goods such that he would not have been relieved from those duties for a deployment remains suspect, however, because there is no evidence that defendant's linguistic skills were, in fact, unique or valuable among the Baltic recruits at Trawniki. There is also no evidence that it was German military practice to take into account such skills when deploying troops.

### C. Zajanckauskas's Deployment to Warsaw

14. On April 17, 1943, German command at Trawniki created a document entitled (in translation) "Roster of guards detailed to the Warsaw Detachment" ("the Roster"). It is stipulated to be authentic. The Roster contains a list of 351 "Trawniki men" who were to be deployed to Warsaw to participate in the liquidation of the Warsaw Ghetto. Zajanckauskas's name and

identification number appear on it at # 6. His listing as a "guard sergeant" (in translation) made him one of the 16 most highly ranked "Trawniki men" on the Roster.

15. Defendant's name was not erroneously included on the Roster. The fact that the Roster correctly identifies his rank and identification number excludes any reasonable possibility that he was included by error. Moreover, in two places on the Roster, where other names had been erroneously included, the transcriber made corrections on the document. No such correction was made with respect to Zajanckauskas.

16. The Roster was not a "draft" to be superceded by a later document. The Court accepts Dr. Black's explanation that the German military did not create draft documents because typewriters rendered document production time consuming and tedious. Furthermore, given that a little more than one day elapsed between the time the Roster was prepared (April 17, 1943) and the time the Trawniki men were deployed (April 18, 1943), even if drafts were sometimes used, it is unlikely that one would have been created in this case. Finally, the Roster was signed by a German officer on a line preceded by the words (in translation) "turned over". It is implausible that an officer would have signed a draft document.

17. The interrogation protocol of Mikhail Laptev discloses that the Trawniki men arrived at Warsaw on the evening of April 18, 1943. The Court accepts Dr. Black's testimony that it took two or three hours to travel from Trawniki to Warsaw, meaning that the troops most likely did not depart Trawniki until the afternoon of April 18, 1943, probably less than one full day after the creation of the Roster.

18. Several German troop transfer orders offered by the government demonstrate that if a document stated that a soldier was to be deployed somewhere and that order was subsequently changed, the German practice was to make a correction to the document. The lack of such a correction with respect to Zajanckauskas's name on the Roster clearly and unequivocally excludes the possibility that his deployment order was changed after the creation of the Roster.

19. The government offered convincing evidence that the Trawniki men listed on the Roster actually arrived in Warsaw. Several Trawniki men who were listed on the Roster (Aleksander Kuris, Mikhail Laptev and Roman Pitrow) admitted, via interrogation protocols, that they had been present in Warsaw and the government offered a telegram sent from German command at Warsaw disclosing the death of Borys Odartschenko, a Trawniki man listed on the Roster. Moreover, there is no documentary evidence to suggest that any man listed on the Roster was anywhere other than in Warsaw during the relevant time period, e.g. there are no reports of injuries or activities involving any of those men occurring elsewhere.

20. The comprehensive German report (with daily addenda) entitled "There is No Jewish Residential Quarter in Warsaw Any More!" ("the Stroop Report") references the deaths or injuries of 13 Trawniki men, all of whom are listed on the Roster.

21. The Stroop Report states (in translation) that there was an "average daily deployment" of 335 Trawniki men in Warsaw during the Ghetto liquidation. To the extent that there is a relationship between the number of Trawniki men listed on the Roster and the "average daily deployment" of Trawniki men in the Stroop Report, the Court discredits the explanation offered by both parties for the following reasons:

a) defendant's reliance on the discrepancy of 16 men as sufficient to forestall the government's proof that Zajanckauskas went to Warsaw is ill-conceived because an "average daily deployment" plainly cannot represent the number of men present on the first day, or any other single day for that matter; and

b) on the other hand, the government's theory, that the 335 figure represents the men on duty on any given day, i.e. some subset of the 351 Trawniki men present at Warsaw, is also demonstrably incorrect because the Stroop Report includes day-by-day reports of the actual number of Trawniki men "available for use" and the number reported is always well below 335. If 335 was an *average* number of the troops available each day, the daily reports would have to include numbers greater than 335.

22. The most plausible meaning of the "average daily deployment" number is that it indicates just what it says: the average number of Trawniki men present in Warsaw on that day, excluding those who were injured or killed while including those available but not on duty. Under that interpretation, assuming that 351 Trawniki men arrived in Warsaw on April 18, 1943, the "average daily deployment" would necessarily be less than 351 because Trawniki men were killed or injured on many of the days of the operation.

23. There is no way to replicate Stroop's calculations because several factors are unknown (e.g. the number of days in the average, the exact criteria for declaring a man "available", whether kitchen staff were counted as being available, etc). Thus, the Court does not adopt either theory offered by the parties with respect to the meaning of the numbers in the Stroop Report.

24. Nonetheless, the Stroop Report does not suggest that fewer than 351 Trawniki men went to Warsaw, nor does it detract from the reliability of the Roster as evidence that the Defendant was deployed to Warsaw. To the contrary, the correlation between the injuries discussed in the Stroop Report and the names on the Roster demonstrates that the Roster accurately recorded the names of those men who were deployed to Warsaw.

25. The defendant's reliance on the fact that approximately 45 Trawniki men listed on the Roster have been interrogated (or have offered testimony) but that not one has placed Zajanckauskas at Warsaw at the crucial time is not probative of whether Zajanckauskas was deployed to Warsaw for the following reasons:

a) of the Trawniki men questioned (eight of whom were in Zajanckauskas's company), only 21 acknowledged their own presence in Warsaw, (two of whom, from what the evidence shows, were in that company),

b) although several men have identified Zajanckauskas as a fellow Trawniki man, none was asked whether Zajanckauskas went to Warsaw,

c) at no time has a Trawniki man in Zajanckauskas's company been asked, or volunteered, to identify any Trawniki men who were deployed to Warsaw, and

d) among Trawniki men in other companies, only one (Mikhail Laptev) identified fellow guards whom he recalled being in Warsaw but he listed only nine such men and there is no evidence that he knew Zajanckauskas.

The lack of such evidence may result from the fact that the focus of the Russian interrogators was, apparently, on who served at Trawniki rather than on those who were deployed elsewhere and it is, therefore, unremarkable that, of the few men who probably knew Zajanckauskas,

no one volunteered his presence in Warsaw without being asked.

26. Accordingly, the government has presented clear, unequivocal and convincing evidence that Zajanckauskas was deployed to Warsaw with a detachment of Trawniki men, as demonstrated by the Roster, supported by other contemporaneous documentary evidence and the explanatory, expert testimony of Dr. Black.

27. In July, 1944, just before the German retreat from the Russian Attack, the Streibel Battalion was formed at Trawniki and Zajanckauskas served in it from its inception. From August, 1944 until January, 1945, the Battalion retreated through Poland and what is now the Czech Republic fleeing the advancing Soviet Army. In March, 1945, Zajanckauskas was discharged from German military service.

### D. Zajanckauskas's Immigration into the United States [1]

28. On January 24, 1950, Zajanckauskas filed Application for Immigration Visa and Alien Registration No. I–511015 with the United States Consulate in Salzburg, Austria.

29. On that application, Zajanckauskas stated that he was in Lithuania from 1929 to 1944. He did not mention his service at Trawniki or his deployment to Warsaw. He was issued Visa No. 382/2035 under the Displaced Persons Act and he entered the United States on February 19, 1950.

30. On April 28, 1956, Zajanckauskas signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service. On June 15, 1956, the Massachusetts Superior Court, sitting in Worcester, Massachusetts, granted the petition and issued to him Certificate of Naturalization No. 7445933.[2]

### II. Conclusions of Law

A. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1345 and by 8 U.S.C. § 1451(a). Venue is proper under 8 U.S.C. § 1451(a).

B. Pursuant to 8 U.S.C. § 1451(a), if the citizenship of a citizen is proven to have been illegally procured, that person's citizenship must be revoked and his Certificate of Naturalization cancelled.

C. Pursuant to 8 U.S.C. § 1427, naturalized citizenship may be legally procured only by those who have been "lawfully admitted to the United States for permanent residence." To meet that standard, an individual must be in possession of a valid visa and be legally eligible for that visa. Fedorenko v. United States, 449 U.S. 490, 507, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981).

D. To establish visa eligibility under the Displaced Persons Act, 62 Stat. 1009 ("the DPA"), the naturalized citizen has the burden of proving that he was "of concern to the International Refugee Organization" ("the IRO").

E. Annex I, Part II, of the Constitution of the IRO identifies certain individuals who are not of concern to the IRO, including "any ... person who can be shown ... to have assisted the enemy in persecuting civilian populations".

F. Section 10 of the DPA renders ineligible for a visa anyone "who shall willfully

---

1. The following facts are undisputed.

2. There is a discrepancy in the parties' various statements with respect to Zajanckauskas's Certificate of Naturalization number. The complaint lists the number as being "7445933" but the Joint Statement of Undisputed Facts (paragraph 49) lists it as "744933". The Court adopts the number set forth in the complaint but, obviously, intends to refer to the correct Certificate of Naturalization, whatever it may be.

make a material misrepresentation for the purpose of gaining admission to the United States as an eligible displaced person". 62 Stat. 1013.

G. In accordance with governing law and, in particular, with *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981) concerning the definition of "material misrepresentation", the parties have stipulated that:

Zajanckauskas's wartime location and activities were material facts capable of affecting the decision of the vice consul who reviewed Zajanckauskas' Application for Immigration Visa in order to determine whether he was eligible under the DPA for an immigrant visa.

The parties have further stipulated that:

If Zajanckauskas went to Warsaw in April and/or May 1943 with a Trawniki-based unit, he made a willful and material misrepresentation of his wartime location and activities to the DPC and on his visa application, and was therefore ineligible under Section 10 of the DPA to receive a visa.

Thus, the parties have agreed that Zajanckauskas's presence in Warsaw in April and/or May 1943 is dispositive.

█ H. In order to divest a naturalized citizen of his citizenship, the government must satisfy a "heavy burden of proof". *Fedorenko,* 449 U.S. at 505, 101 S.Ct. 737; *United States v. Reimer,* 2002 WL 32101927 (S.D.N.Y. Sept. 3, 2002). "The evidence justifying revocation of citizenship must be clear, unequivocal, and convincing and not leave the issue in doubt." *Id.*

█ I. The Roster, supporting contemporaneous documents and the testimony of Dr. Black prove, to the satisfaction of the above standard, that Zajanckauskas was present in Warsaw in April and/or May of 1943.

J. Therefore, Zajanckauskas has made a willful and material misrepresentation on his visa application and he was not legally eligible for a visa under the DPA. *See* 62 Stat. 1013.

K. Because Zajanckauskas was not eligible for a visa under the DPA, his admission into the United States in 1950 was unlawful.

L. Because Zajanckauskas was not lawfully admitted into the United States, his subsequent naturalization in 1956 was unlawful under 8 U.S.C. § 1427(a).

M. Accordingly, the defendant's citizenship must be revoked and his Certificate of Naturalization cancelled. *Id.* § 1451(a).

### ORDER

Judgment will enter for the plaintiff as follows:

1) the defendant's United States citizenship is revoked and the Order of the Superior Court of Massachusetts, sitting in Worcester, Massachusetts, dated June 15, 1956 admitting the defendant to citizenship is vacated. The defendant's Certificate of Naturalization, issued pursuant to that Order, is cancelled;

2) the defendant is permanently enjoined from claiming any rights, privileges, benefits or advantages under any document evidencing United States Citizenship; and

3) the defendant shall immediately surrender and deliver to the Attorney General his Certificate of Naturalization, his United States passport, should he have one, and any other indicia of United States citizenship.

**So ordered.**