# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1667

_____

United States of America

*Plaintiff - Appellee*

v.

Abdulla Nagi Naser Daifullah, also known as Abdullah Nagi Naser Daifullah, also known as Saleh Ahmed Altawalh, also known as Saleh Ahmed Altwaih, also known as Saleh Ahmed Al-Tawalh

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: January 13, 2021
Filed: September 1, 2021

_____

Before LOKEN, GRASZ, and KOBES, Circuit Judges.

_____

GRASZ, Circuit Judge.

The United States government sought to revoke Abdulla Nagi Naser Daifullah's citizenship because he entered the country and sought asylum using a false identity and then concealed this deception when later applying for

naturalization under his true identity. The district court[1] granted summary judgment to the government. Daifullah appeals, arguing the district court lacked subject matter jurisdiction over the case due to the government's failure to comply with a statutory requirement for the local United States Attorney to "institute" the proceedings (the "U.S. Attorney Rule"). *See* 8 U.S.C. § 1451(a). Alternatively, Daifullah argues the district court erred in granting summary judgment in light of purported factual disputes. We affirm.

## I. Background

In October 1991, the United States admitted Daifullah as a nonimmigrant visitor from Yemen. To gain admission, Daifullah used a Yemeni passport under a false name: "Saleh Ahmed Altawalh." Daifullah claimed he made up his false identity to prevent his father from learning about his traveling to the United States.

Again using the fictitious "Altawalh" identity, Daifullah applied for asylum. Daifullah's asylum paperwork asserted his false identity and included a tale about being part of anti-Yemeni government activities. The application claimed: (1) "Altawalh" worked with the Islamic Reform Opposition Party; (2) the Yemeni government had arrested him and labelled him a subversive element; and (3) his "whole family suddenly was put in the crossfire." None of this was true. Daifullah had not been active in politics, was never arrested, and his family was not in danger.

In 1996, the Immigration and Naturalization Service ("INS")[2] denied Daifullah's asylum application, concluding that he had not established past persecution or a well-founded fear of future persecution. INS referred the

---

[1]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

[2]The functions of INS have since been transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

application to an immigration judge ("IJ"), who issued a show cause order and notice of hearing for deportation based on Daifullah overstaying his nonimmigrant visa. In response, Daifullah submitted an affidavit in both English and Arabic, which again falsely asserted under oath that he had opposed Yemeni governmental authorities and that his "open and vociferous stance" had caused him "unbearable hardships" and made him subject to imprisonment, torture, and execution. In July 1997, Daifullah personally appeared before the immigration court, withdrew his asylum application, and applied for voluntary departure. The IJ granted Daifullah's application for voluntary departure and Daifullah later returned to Yemen.

Nearly a decade later, in early 2006, Daifullah submitted another visa application to the United States. While Daifullah's application included his real identity, it also falsely claimed that he had never visited or resided in the United States. Daifullah ultimately obtained an F31 immigrant visa, which applies to the married son or daughter of a U.S. citizen. Daifullah was admitted in March 2006.

Daifullah applied for naturalization in 2011. Daifullah's application, submitted under penalty of perjury, again included false statements. He responded "none," when asked to list other names used, and denied giving "false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal." Daifullah also denied lying to a "U.S. Government official to gain entry or admission into the United States" or applying for any kind of relief from deportation, exclusion, or removal.

In December 2011, the government interviewed Daifullah under oath regarding his naturalization application. The interview was stopped and then completed in January 2012 with the assistance of a translator. Daifullah signed the naturalization application, swearing and certifying that the contents of the application were true and correct to the best of his knowledge and belief.

In April 2012, Daifullah's naturalization was approved and he soon took the oath of allegiance and became a naturalized citizen. The government official who

adjudicated Daifullah's application for citizenship testified that had she known the truth about his immigration history under the false identity of "Altawalh," she would not have approved his naturalization application without further inquiry to see if he had willfully misrepresented facts and was inadmissible to the United States under 8 U.S.C. § 1182(a)(6)(C)(i).

Over six years later, the government sought to revoke Daifullah's naturalization under 8 U.S.C. § 1451(a). The government alleged Daifullah: (1) illegally procured his naturalization because he was not lawfully admitted for permanent residence on account of the misrepresentations he made when applying for his visa and asylum; and (2) willfully misrepresented and concealed his identity and immigration history during naturalization proceedings.[3] After reviewing the parties' cross-motions for summary judgment, the district court awarded summary judgment to the government on both counts.

## II. Discussion

Daifullah advances two primary arguments. Daifullah first argues the district court lacked subject matter jurisdiction over the case because the government did not follow the U.S. Attorney Rule by having the local U.S. Attorney "institute" the proceedings. *See* 8 U.S.C. § 1451(a). Alternatively, Daifullah claims the district court erred in granting summary judgment to the government. We address each argument in turn.

## A. Subject Matter Jurisdiction

We first consider Daifullah's contention that the district court lacked subject matter jurisdiction because the government failed to comply with the U.S. Attorney Rule. The statutory text states:

---

[3]The government also alleged Daifullah was not lawfully admitted because he failed to depart from the United States before his voluntary departure deadline passed, but it later abandoned this count.

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing the suit[.]

8 U.S.C. § 1451(a).

Daifullah argues "the term 'institute' has been understood to mean the actual filing in a court of the necessary documentation to commence or begin a legal action and represents the distinct event of beginning an original proceeding in a court[.]" *See generally Post v. United States*, 161 U.S. 583, 587 (1896) ("Criminal proceedings cannot be said to be brought or *instituted* until a formal charge is openly made against the accused, either by indictment presented or information filed in court, or, at the least, by complaint before a magistrate.") (emphasis added); *Institute*, Black's Law Dictionary (11th ed. 2019) ("To begin or start; commence."). And so, he maintains that § 1451(a) requires the local U.S. Attorney to file the revocation complaint. Because the U.S. Attorney here was indisputably not included on the pleadings, Daifullah argues that the government violated the U.S. Attorney Rule, and this failure deprived the district court of subject matter jurisdiction.

The government counters that Daifullah waived the issue by first raising it on appeal. Further, the government maintains it complied with the U.S. Attorney Rule because it obtained the local U.S. Attorney's authorization, via email, to file the complaint. *See United States v. Olivar*, 648 F. App'x 675, 676 (9th Cir. 2016) (unpublished) (holding that a letter from the U.S. Attorney authorizing the litigation was enough to satisfy the U.S. Attorney Rule); *United States v. Borgono*, No. 18-21835, 2019 WL 1755709, at *2 (S.D. Fla. Apr. 19, 2019) (explaining that requiring the U.S. Attorney to sign the complaint to comply with the U.S. Attorney Rule would constitute "hypertechnical reliance on form over substance"). According to the government, this authorization was sufficient to comply with the statutory mandate.

"Ordinarily, we will not consider an argument raised for the first time on appeal." *United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016). However, if failure to follow the U.S. Attorney Rule deprived the district court of subject matter jurisdiction, then the issue cannot be waived or forfeited. *See Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011). Therefore, to decide whether Daifullah waived his argument by failing to raise it to the district court, we must first decide whether the U.S. Attorney Rule is indeed jurisdictional. It is not.

The Supreme Court has "urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Id.* at 435. The "jurisdictional brand" should not be given to other rules, even if they are "important and mandatory." *Id.* Congress may, however, "attach the conditions that go with the jurisdiction label to a rule that" may otherwise have the character of a claims-processing rule. *Id.* There are no "magic words" required to make a rule jurisdictional. *Id.* at 436. To decide whether Congress intended a rule to be jurisdictional, we are to "look to see if there is any 'clear' indication that Congress wanted" that result. *Id.*

The Supreme Court has instructed us to look to the text of the statute and the statute's placement within the statutory scheme to discern congressional intent. *Id.* We should also look to the Supreme Court's past treatment of similar provisions to decipher congressional intent. *Id.* None of these factors suggest Congress wanted the U.S. Attorney Rule to be jurisdictional.

First, § 1451(a)'s plain language and its placement in the statute indicate that the U.S. Attorney Rule is not jurisdictional. Subsection (a) never mentions the word "jurisdiction." Nor does it otherwise suggest the failure to comply with its rule would deprive the court of subject matter jurisdiction. While the U.S. Attorney Rule uses mandatory language, that does not mean it is jurisdictional. *See Henderson*, 562 U.S. at 435 (emphasizing that even rules that are "important and mandatory . . . should not be given the jurisdictional brand"). Further, subsection (e) discusses a court's subject matter jurisdiction, conferring jurisdiction to revoke citizenship on a

district court who presides over a criminal conviction under 18 U.S.C. § 1425. Congress's choice to address jurisdiction in a separate subsection hints that it did not intend noncompliance with the U.S. Attorney Rule to strip a district court of jurisdiction. *See Kucana v. Holder*, 558 U.S. 233, 249 (2010) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original) (quoting *Nken v. Holder*, 556 U.S. 418, 430 (2009)).

In addition, there is an absence of Supreme Court decisions treating similar provisions as invoking subject matter jurisdiction. To urge us to conclude otherwise and treat the U.S. Attorney Rule as jurisdictional, Daifullah points to two Supreme Court cases that address a different requirement in § 1451(a)—that the U.S. Attorney file an affidavit for good cause to maintain a revocation suit. *See Costello v. United States*, 365 U.S. 265 (1961) (holding a dismissal for failure to file an affidavit of good cause would be "without prejudice" under Fed. R. Civ. P. 41(b) because it was not decided on the merits and referring to the rule as "jurisdictional"); *United States v. Zucca*, 351 U.S. 91, 99–100 (1956) (holding "the District Attorney must, as a prerequisite to the initiation of [civil revocation] proceedings, file an affidavit showing good cause" as a "procedural prerequisite to the maintenance of proceedings thereunder").

We do not view these two cases as helpful to Daifullah's argument. Although *Costello* and *Zucca* both used the term "jurisdictional" when discussing the mandatory affidavit rule, they predate the Supreme Court's concerted effort to use that term in a more disciplined fashion. *See Henderson*, 562 U.S. at 435 (explaining the consequences of labeling a rule "jurisdictional" had caused the Supreme Court more recently to attempt "to bring some discipline to the use of this term"); *Union Pac. R.R. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81 (2009) (explaining the Supreme Court had, in the past, used the word "jurisdiction" too broadly to encompass different meanings). Moreover, both cases contain clues the Supreme Court did not believe failure to follow the affidavit rule

deprived a federal court of subject matter jurisdiction. In *Costello*, for example, the Supreme Court recognized a distinction between violation of the mandatory affidavit rule and "fundamental jurisdictional defects which render a judgment void and subject to collateral attack, such as lack of jurisdiction over the person or subject matter." 365 U.S. at 285. And in *Zucca*, the Supreme Court described the affidavit rule as a "procedural prerequisite." 351 U.S. at 100. Citing that language, the Ninth Circuit rejected an argument that the affidavit rule deprived a court of subject matter jurisdiction. *See Title v. United States*, 263 F.2d 28, 30 (9th Cir. 1959) (explaining it had to "assume that there was a purpose in the [Supreme Court's language in *Zucca*] referenc[ing] . . . a 'procedural' prerequisite rather than a 'jurisdictional' prerequisite").

With Daifullah unable to marshal any of the relevant factors to show Congress clearly intended the U.S. Attorney Rule to be jurisdictional, we hold that the government's purported noncompliance with the rule did not deprive the district court of subject matter jurisdiction. Because no jurisdictional defect exists, we decline to consider Daifullah's fact-bound argument in the first instance. *See Fleck v. Wetch*, 937 F.3d 1112, 1116 (8th Cir. 2019) (explaining that generally "we will not consider arguments raised for the first time on appeal 'as a basis for reversal'" and noting we will exercise our discretion to decide such an issue only when the answer is obvious or it is a purely legal issue and additional evidence would not impact the outcome) (quoting *von-Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 375 (8th Cir. 1997)).

## B. Summary Judgment

We next consider de novo whether, as Daifullah argues, the district court erred in granting the government summary judgment. *See Hirani*, 824 F.3d at 746 (standard of review). "Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1009 (8th Cir. 2016)); Fed. R. Civ. P. 56.

-8-

"The Government carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship because the loss of American citizenship can have severe and unsettling consequences." *Id.* (cleaned up) (quoting *Fedorenko v. United States*, 449 U.S. 490, 505 (1981)). The evidence in support must be "clear, unequivocal, and convincing," making resolution free from doubt. *Id.* (quoting same). This is akin to the beyond-a-reasonable-doubt standard used in criminal cases. *Id.* Either direct or "circumstantial evidence may constitute evidence that is clear, unequivocal, and convincing." *Id.* at 747.

To revoke citizenship, the government must prove the order of naturalization was either (1) "illegally procured" or (2) "procured by concealment of a material fact or by willful misrepresentation." § 1451(a). If the government proves either, the district court must enter a judgment of denaturalization. *Fedorenko*, 449 U.S. at 517.

Here, the district court held the undisputed evidence showed that revocation of Daifullah's citizenship was warranted on both grounds—illegal procurement of his naturalization *and* procurement of his naturalization by concealment or misrepresentation of a material fact. The *reason* the district court concluded both grounds were met was because it believed Daifullah willfully made misrepresentations and concealed material facts throughout his encounters with United States immigration authorities—both in the 1990s during his first effort to obtain asylum under the false "Altawalh" identity (illegal procurement), and decades later when obtaining his immigrant visa (illegal procurement) and then becoming a citizen under his real identity (procurement by misrepresentation).[4]

---

[4]The illegal procurement conclusion requires some explanation. Failure to strictly comply with "congressionally imposed prerequisites to the acquisition of citizenship . . . renders the certificate of citizenship 'illegally procured.'" *Fedorenko*, 449 U.S. at 506. As a prerequisite for naturalization, Daifullah must have been lawfully admitted to the United States for permanent residence. *See* 8 U.S.C. §§ 1427(a), 1429 (explaining that "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this chapter"). For permanent resident

We see no fault in the district court's well-reasoned order. We focus our analysis primarily on the misrepresentations and concealment of material facts Daifullah made when procuring his citizenship. The government must establish four elements to revoke naturalization based on a misrepresentation or concealment: "(1) the naturalized citizen must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have procured his citizenship as a result of the misrepresentation or concealment." *Hirani*, 824 F.3d at 748.

### 1. Misrepresentations

As the district court observed, the undisputed evidence shows that when applying for citizenship, Daifullah falsely represented that he had: (1) used no names other than Daifullah in immigration proceedings; (2) not given false information to government officials while applying for an immigration benefit; (3) not lied to a government official so as to enter the United States; and (4) not applied for any kind of relief from removal. Daifullah does not meaningfully dispute the fact that misrepresentations were made in his naturalization application. We therefore hold this element was satisfied.

---

status to have been "lawfully accorded," 8 U.S.C. § 1101(a)(20), the grant of that status must have been in substantial compliance with the immigration laws. *Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1186 (8th Cir. 2005). Daifullah thus was not "lawfully admitted" if he was not legally entitled to permanent resident status when he received it. *Id.* Per the district court, Daifullah was not lawfully admitted for permanent residence because he willfully misrepresented material facts both in 1996 when he sought to procure asylum under his false identity and later in 2006 when he obtained his immigrant visa to come back into the country under his real identity. *See* 8 U.S.C. § 1182(a)(6)(C)(i) (providing that an alien is inadmissible and ineligible to be admitted when he, "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under [certain immigration laws]").

-10-

## 2. Willfulness

The district court held that the government put forth sufficient evidence to show that Daifullah willfully made these misrepresentations. Rejecting Daifullah's excuse that he personally did not fill out the application, the district court emphasized the undisputed fact that he twice signed the application under penalty of perjury, which it thought was "sufficient to establish by clear, unequivocal, and convincing evidence that [Daifullah] made the misrepresentations." We agree.

In *Hirani*, we faced similar circumstances. There, a citizen's application for naturalization included a false birth date and false assertions that the applicant had never (1) used another name, (2) given false information to attain an immigration benefit, or (3) been deported from the United States. 824 F.3d at 745–46. Like Daifullah, Hirani claimed he relied on third parties to complete his application. *Id.* at 745, 748. We rejected this argument, pointing out the applicant signed the documents and certified the accuracy of their contents, which was "sufficient to show, clearly, unequivocally, and convincingly, that [Hirani] made the misrepresentations." *Id.* After all, "[t]he government is not required to prove intent to deceive, but rather must demonstrate only that an applicant willfully made a representation that does not accord with the facts." *Id.* at 749. We then held that Hirani's "signature under penalty of perjury affirming" the misrepresentations showed that they were willful. *Id.* The same is true here.

Daifullah contends his case differs from *Hirani* because he does not speak or understand English well, is illiterate, and relied on a third party to fill out his form. He also says his situation departs from *Hirani* because he has moderate to severe cognitive impairment, as demonstrated by the disability waiver he received when applying for citizenship. According to Daifullah, these facts combine to create an inference that he did not act willfully and therefore summary judgment on the issue was improper. We are unpersuaded. There is *no* evidence that he was unable to understand simple questions and answers about his past use of a false identity during his previous attempt to enter and live in the country. Instead, record evidence shows

-11-

the opposite. For example, his deposition testimony reveals he *clearly understood* he had come into the country under a false identity. While Daifullah claimed that he did not feel it necessary to volunteer his previous immigration history unless asked, this excuse is nonsensical. The undisputed facts show that the government directly asked him questions, which, if given truthful responses, would have revealed Daifullah's immigration history under his false identity. And the written answers he gave—twice certified as accurate under oath—affirmatively misrepresented and concealed the truth. This record does not allow us to distinguish *Hirani*.

### 3. Materiality

We next address the misrepresentation's materiality, which is a legal question. *See Hirani*, 824 F.3d at 749. "A concealment or misrepresentation is material if it has that 'natural tendency to influence the decisions of'" those deciding whether to confer citizenship. *Id.* (quoting *Kungys v. United States*, 485 U.S. 759, 772 (1988)). More specifically, the test "is whether the misrepresentation or concealment had a natural tendency to produce the conclusion that the applicant was qualified." *Id.* (quoting *Kungys*, 485 U.S. at 771–72). When the truth "would predictably have disclosed other facts relevant to [the applicant's] qualifications" for citizenship, the misrepresentation or concealment is material. *Id.* (alteration in original) (quoting *Kungys*, 485 U.S. at 774).

Using this test, we hold that Daifullah's misrepresentations were material. As the district court observed, "[b]y not answering truthfully about his prior use of a false identity and false information to apply for asylum, [Daifullah] foreclosed the line of inquiry," showing he was inadmissible under § 1182(a)(6)(C)(i), and thus ineligible for admission because he was not lawfully admitted for permanent residence. The government submitted sworn testimony from the immigration official who adjudicated Daifullah's naturalization application. The official stated that had she known Daifullah used a false identity to enter the country and made false claims in his asylum application, this would have at least led her to ask more questions. She also testified that those facts indicated Daifullah was likely

-12-

inadmissible under § 1182(a)(6)(C)(i).[5]  This undisputed evidence is enough to establish the materiality of the misrepresentations.

### 4.  Procurement By Misrepresentation

This brings us to the final element—whether Daifullah "procured his naturalization as a result" of his misrepresentations.  *Hirani*, 824 F.3d at 750.  "An applicant 'procures' naturalization on the basis of a misrepresentation if there is a causal connection between the misrepresentation and the acquisition of citizenship." *Id.*  The district court can presume that citizenship was procured by a misrepresentation so long as the government shows "the citizen misrepresented a material fact *and* it is 'fair to infer that the citizen was actually ineligible.'"  *Id.* (quoting *United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009)).

The district court properly presumed Daifullah procured his citizenship via misrepresentations because the government showed that had Daifullah truthfully represented his past efforts to enter the United States and obtain asylum under a false identity, he would have been inadmissible under 8 U.S.C. § 1182(a), thus ineligible for lawful permanent residence, and therefore excluded from naturalization under § 1429.  *See Hirani*, 824 F.3d at 752.  "Because [Daifullah's] material misrepresentations concealed his statutory ineligibility to naturalize, [Daifullah] procured his naturalization on the basis of those misrepresentations."  *Id.*

---

[5]Daifullah asks us to reverse the denial of his motion to strike parts of the immigration official's affidavit.  We "review the admission of evidence for consideration at the summary judgment stage for an abuse of discretion."  *Warner Bros. Ent, Inc. v. X One X Prods.*, 644 F.3d 584, 592 (8th Cir. 2011).  "A lay witness may give an opinion if it is rationally based on the perception of the witness and would help the factfinder determine a matter in issue."  *Id.* at 592 (quoting *Hurst v. United States*, 882 F.2d 306, 312 (8th Cir. 1989)).  This standard is met here as the immigration official's testimony shows the materiality of Daifullah's misrepresentations—revelation of the truth "would predictably have disclosed other facts relevant" to the applicant's qualifications for citizenship.  *Hirani*, 824 F.3d at 749.

## III. Conclusion

For these reasons, we affirm the district court's judgment.

_____